UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Crim. No. 23-mj-4293-DHH |
| | ) | |
| v. | ) | |
| | ) | |
| JACK DOUGLAS TEIXEIRA, | ) | |
| | ) | |
| | ) | |
| Defendant. | | |

# GOVERNMENT'S SUPPLEMENTAL MOTION IN SUPPORT OF PRETRIAL DETENTION

Defendant Air National Guardsman Jack Douglas Teixeira ("the Defendant") has been charged with unauthorized disclosures of classified national defense information in violation of the Espionage Act, 18 U.S.C. § 793(b) and (d), and the Act prohibiting Unauthorized Removal or Retention of Classified Documents or Material, 18 U.S.C. § 1924. All of the charged offenses are felonies.

The government respectfully submits that the Defendant must remain detained pursuant to 18 U.S.C. § 3142(f)(2)(A) and (B).

In the first place, the Defendant poses a serious flight risk. He currently faces 25 years in prison—and potentially far more—and other serious consequences for his conduct; the evidence against him is substantial and mounting; the charged conduct would very obviously end his military career; and he accessed and may still have access to a trove of classified information that would be of tremendous value to hostile nation states that could offer him safe harbor and attempt to facilitate his escape from the United States.

Second, the Defendant's own obstructive and deceptive acts to date compound his risk of flight and dangerousness, have undermined any counterarguments he could offer in response, and give rise to "a serious risk that such person will obstruct or attempt to obstruct justice." 18 U.S.C. § 3142 (f)(2)(B). Not only does the Defendant stand charged with having betrayed his oath and his country but—when those actions began to surface—he appears to have taken a series of obstructive steps intended to thwart the government's ability to ascertain the full scope of what he has obtained and the universe of unauthorized users with whom he shared these materials. This includes instructions the Defendant gave to other online members of a social media platform (including to "delete all messages" and "[i]f anyone comes looking, don't tell them shit") as well as the fact that following his arrest, authorities searched a dumpster at his residence and found a tablet, a laptop, and an Xbox gaming console, all of which had been smashed. These efforts appeared calculated to delay or prevent the government from gaining a full understanding of the seriousness and scale of his conduct. Any promise by the Defendant to stay home or to refrain from compounding the harm that he has already caused is worth no more than his broken promises to protect classified national defense information. And if the Defendant were released, it would be all too easy for him to further disseminate classified information and would create the unacceptable risk that he would flee the United States and take refuge with a foreign adversary to avoid the reach of U.S. law.

Third, the Defendant poses an ongoing risk both to the national security of the United States and to the community. The nature of the materials that the Defendant accessed—not all of which have publicly surfaced—have the capacity to cause additional exceptionally grave damage to the U.S. national security if disclosed. In addition, the Defendant's troubling history raises serious concerns about what he would do if released into the community.[1]

---

[1] As discussed more fully below, the Defendant was suspended in high school based on concerning comments the Defendant made about Molotov cocktails and other weapons. The Defendant, who owned multiple guns, including a

2

Any one of the foregoing reasons warrants the Defendant's detention. Taken together, the case for the Defendant's detention pending trial is overwhelming.

I. **STATEMENT OF PRIOR PROCEEDINGS**

On April 13, 2023, the government charged the Defendant by criminal complaint (23-mj-4293-DHH) with violations of 18 U.S.C. § 793(b) and (d) and 18 U.S.C. § 1924. The Complaint alleges that the Defendant made unauthorized disclosures of a significant amount of classified information and disseminated that information without authorization to individuals—who likely included foreign citizens—not entitled to receive that information.

On April 14, 2023, at the Defendant's initial appearance, the government moved for detention pursuant to 18 U.S.C. § 3142(f)(2)(A) and (B) because no condition or combination of conditions will reasonably ensure that the Defendant does not flee, and that the Defendant would not take further steps to obstruct justice, including through the destruction of evidence or other action that would further endanger the U.S. national security or the physical safety of his community. The government now supplements its earlier, oral motion for pretrial detention.[2]

II. **STATEMENT OF PROFFERED FACTS**

The government proffers facts herein in support of the Defendant's flight risk and danger to the community through counsel and the attached declarations (attached hereto as Attachments A through K).[3]

---

high-capacity AK-style weapon, had regular discussions about violence and murder on the social media platform on which he disclosed the classified information.

[2] The government's motion is timely. *See United States v. Vargas*, 804 F.2d 157, 161 (1st Cir. 1986).

[3] The Federal Rules of Evidence do not apply to pretrial detention hearings. *See* 18 U.S.C. § 3142(f)(2)(B) ("The Rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing."); *see also* FED. R. EVID. 1101(d)(3) (exception to application of federal evidence rules for "miscellaneous proceedings such as . . . considering whether to release on bail or otherwise."). Defendants at pretrial detention hearings are expressly authorized by the Bail Reform Act of 1984 to "present information by proffer or otherwise." 18 U.S.C. § 3142(f)(2)(B). Because the Act ratified existing practice, the government is likewise authorized to present information by proffer. Prior to the initial detention hearing, the government advised defense counsel that it intended to proceed by proffer. Defense counsel did not object.

### A. The Defendant's Professional History

The Defendant enlisted in the U.S. Air National Guard ("USANG") in September 2019. Since May 2022, the Defendant has served as an E-3/Airman, with the title of Cyber Defense Operations Journeyman. During that time, he was stationed at Otis Air National Guard Base in Massachusetts.

The Defendant held a security clearance at the Top Secret//Sensitive Compartmented information level since 2021. In connection with his enlistment, the Defendant signed multiple security and non-disclosure agreements, including, among others, a Sensitive Compartmented Information Nondisclosure Agreement; a Rules of Behavior and Acceptable Use Standard for Information Technology Agreement; and a General Information Systems Acceptable Use Policy and User Agreement *See* Attachments A ("SCINA"), B ("Rules") and C ("General Information"). As part of these agreements, the Defendant agreed, among other things, that he would "never divulge anything marked as SCI or that I know to be SCI to anyone who is not authorized to receive it without prior written authorization from the United States Government department or agency . . . that last authorized my access to SCI." In some of these agreements, the Defendant also acknowledged that the unauthorized disclosure of classified information could constitute a criminal offense.

Nevertheless, government records reflect that, beginning in approximately February 2022, the Defendant began to access hundreds of classified documents containing national defense information that had no bearing on his role as essentially an information technology ("IT") support specialist. *See* Attachment D, (the Church Audit Declaration).

4

### B. The Defendant's Personal History

The Defendant is twenty-one years old. The Defendant graduated from high school in 2019 and does not have a college degree. In March 2018, while still in high school, the Defendant was suspended when a classmate overheard him make remarks about weapons, including Molotov cocktails, guns at the school, and racial threats. In the pretrial services interview, the Defendant attributed those remarks to a reference to a video game.[4] See Attachment E, (Dighton Police Reports, redacted and filed separately under seal).

In 2018, while still a teenager, the Defendant applied for a firearms identification card ("FID"). His application was denied due to the concerns of the local police department over the Defendant's remarks at his high school. The Defendant remained undeterred and applied again in 2019 and 2020. In his 2020 application, the Defendant cited his position of trust in the United States government as a reason he could be trusted to possess a firearm. See Attachment F, (the Teixeira Letter).

The Defendant's primary residence is with his mother and stepfather in North Dighton, Massachusetts. The Defendant kept his gun locker approximately two feet from his bed. See Attachment G, (Search photos of Defendant's room). In the gun locker were multiple weapons, including handguns, bolt-action rifles, shotguns, an AK-style high-capacity weapon, and a gas mask. FBI special agents also found ammunition and tactical pouches on his dresser and what appeared to be a silencer-style accessory in his desk drawer. Id. When FBI special agents searched the dumpster outside the house, they located a military-style helmet with a mounting bracket—

---

[4] The government has reviewed records relating to the 2018 incident from the Dighton Police Department. In these reports, a copy of which is being provided to the court and counsel under seal, the Defendant admitted he had been told to not speak of guns at school. The Defendant claimed he was speaking about a video game. Other students, however, indicated that Defendant's comments about the Molotov cocktail and guns were not related to any conversations about a video game.

such as those used for cameras—affixed to the top of the helmet. A GoPro camera[5] was also found in the dumpster. *See* Attachment H, (GoPro photo).

A review of records received from a social media platform also indicate that the Defendant regularly made comments about violence and murder. *See* Attachment I, (the Church Social Media Declaration). The Defendant's statements included the following:

- In November 2022, the Defendant stated that if he had his way, he would "kill a [expletive] ton of people" because it would be "culling the weak minded."

- In February 2023, the Defendant told a user that he was tempted to make a specific type of minivan into an "assassination van."

- Also in February 2023, the Defendant sought advice from another user about what type of rifle would be easy to operate from the back of an SUV. He describes how he would conduct the shooting in a "crowded urban or suburban environment."

- In March 2023, the Defendant described SUVs and crossovers as "mobile gun trucks" and "[o]ff-road and good assassination vehicles."

**C. The Defendant's Behavior Prior to Arrest**

The Complaint Affidavit alleges that the Defendant posted Government Information (as defined therein) to a social media platform beginning in or around December 2022. Records from the social media platform reflect that the Defendant was an administrator of the server where the Government Information was posted. Those records also reflect the following activity under the username associated with the Defendant:

- The Defendant posted photographs of certain of his prior posts containing information that appears U.S. government classified information;

- The Defendant acknowledged on multiple occasions that he had posted classified information and that he had done so before December 2022;

- The Defendant referenced the intelligence community agencies from which the information was allegedly derived;

---

[5] A GoPro camera is a durable camera that can be mounted to a helmet or sports equipment to record live action content.

- The Defendant encouraged other users to make specific requests for information they wanted to see him post;

- In March 2023, the Defendant stated that, although he "was very happy and willing and enthusiastic to have covered this event for the past year and share with all of you something that very few people in fact, get to see . . . I've decided to stop with the updates"; and

- In April 2023, the Defendant began using a new username, told another user that "[i]f anyone comes looking, don't tell them shit." He also encouraged that user to "delete all messages" and told him to pass the message on to other users to do the same.

See Attachment I.

In or around April 2023, the server where the Government Information described in Complaint was posted ceased to exist, suggesting that the server administrator—the Defendant—deleted the server in its entirety.

The Defendant also appears to have engaged in the attempted physical destruction of other evidence prior to his arrest. A search of the dumpster at the Defendant's residence uncovered a tablet, a laptop, and an Xbox gaming console. See Attachment J, (Search photos of devices and location). All three devices were physically smashed. The FBI also located a box for a new iPhone in the dumpster. Id. The Defendant told several colleagues just two days before his arrest that he had a new phone number and email address. The Defendant told one colleague that his phone had flown out of his truck window and was run over by a semi-truck. See Attachment D.

### III.   STANDARD OF PROOF AND STATUTORY FACTORS

Congress empowered judicial officers to release or detain defendants pending trial. 18 U.S.C. § 3141(a). Detention determinations proceed pursuant to the terms of 18 U.S.C. § 3142. Under § 3142(f)(2), the Court must hold a detention hearing upon the government's motion (or *sua sponte*) when the case involves "a serious risk that [the defendant] will flee" or "a serious risk that [the defendant] will obstruct or attempt to obstruct justice." 18 U.S.C. § 3142(f)(2). Ultimately, the Court shall detain a criminal defendant pending trial upon a determination that "no

condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community...." 18 U.S.C. § 3142(e); *United States v. Montalvo–Murillo*, 495 U.S. 711, 716–17 (1990). On the issue of flight, the government must prove that the defendant is a serious risk of flight by a preponderance of the evidence. *United States v. Patriarca*, 948 F.2d 789, 791-93 (1st Cir. 1991).

Although the Court cannot order the defendant's detention based on dangerousness alone, *see United States v. Ploof*, 851 F.2d 7, 11 (1st Cir. 1988), obstruction of justice is a stand-alone basis justifying detention pending trial. *See United States v. Acevedo-Ramos*, 755 F.2d 203 (1st Cir. 1985) (upholding detention before trial based on the risk that the defendant would obstruct or attempt to obstruct justice); *see also U.S. v. Mehanna*, 669 F. Supp. 2d 160, 160, 166 (noting that obstruction is an independent ground for detention under (f)(2) and finding that the government met its burden to detain the defendant on that basis). Once the Court determines that the government has met its burden under risk of flight and/or obstruction of justice, dangerousness is a relevant consideration in determining whether the Defendant can ultimately be released on conditions.

In evaluating whether conditions can reasonably be fashioned, the Court must consider the following: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the defendant's history and personal characteristics; and (4) dangerousness. 18 U.S.C. § 3142(g). With respect to dangerousness, the Senate Report accompanying the Bail Reform Act explains that dangerousness is not limited to physical violence and includes continued criminal activity:

> The reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.

S. Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3195; *see United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) ("Danger, in this context, was not meant to refer only to the risk of physical violence.").

In prior cases alleging unauthorized removal and disclosure of classified national defense information, courts have readily found that the risk of future disclosures is a danger to the community sufficient to support pretrial detention. *See United States v. Winner*, 1:17-cr-00034-JRH-BKE, Dkt. 163, at 14 (S.D. Ga. Nov. 27, 2017) ("Given the uncertainty with respect to Defendant's level of knowledge or possession of classified information, together with evidence that she planned to anonymously release information to online news outlets and that she has antipathy toward the United States, the Court finds that releasing Defendant prior to trial would pose a danger to the community, particularly to the national security."); *United States v. Martin*, 1:17-cr-00069-RDB, Dkt. 24 (D. Md. Oct. 21, 2016) ("Under 3142(g)(4) – if considered, [the defendant's] release presents a serious risk of danger to the *public due to his information, knowledge he possesses.*")  (18 U.S.C. § 793 charge; emphasis added).

### IV.    ARGUMENT: THE DEFENDANT SHOULD BE DETAINED PENDING TRIAL

The Defendant is accused of criminal conduct that reflects a profound breach of the trust our nation placed in him. He engaged in an incredibly large and damaging dissemination of classified national defense information and faces a significant term of imprisonment upon conviction. He has an enormous incentive to flee, and there are numerous adversaries of the United States that could provide him the means to do so, regardless of the conditions set by the Court. Additionally, his release would heighten the risk that he would make further unauthorized disclosures of classified national defense information. Further, it is clear that the Defendant has already attempted to obstruct justice by destroying evidence and tampering with witnesses.

Analyzed in light of the factors listed under the Bail Reform Act, there is no condition of release that can be set that will reasonably assure his future appearance at court proceedings or the safety of the community. He should be detained.

### A. Nature and Circumstances of the Offense Charged – 18 U.S.C. 3142(g)(1)

The seriousness of the offense supports detention. The Defendant is currently charged with the unauthorized disclosure of a Top Secret document concerning the status of the Russia-Ukraine conflict, including troop movements. By definition, the disclosure of Top Secret information can be expected to cause exceptionally grave danger to the U.S. national security.

### B. Weight of the Evidence Against the Person – 18 U.S.C. 3142(g)(2)

The weight of the government's evidence is strong. The forensic evidence against the Defendant is overwhelming and includes records of searches the Defendant made on his government computer, multiple admissions by the Defendant to transmitting classified information, and requests to others once his conduct became public to delete information tying him to the crime. Additionally, there is physical evidence that supports the contention that the Defendant, having illegally accessed classified documents, brought documents to the home he shared with his parents and photographed those documents there.

### C. History and Characteristics of the Person – 18 U.S.C. 3142(g)(3)

The Defendant is a twenty-one-year-old man who is facing exceptionally grave legal peril both in the U.S. criminal justice system and in the consequences that are likely to be imposed by the U.S. military system. As multiple courts have noted, the more severe the sentence, the greater a defendant's incentive to flee. *United States v. Pierce*, 107 F. Supp. 2d 126, 128 (D. Mass. 2000) (upholding magistrate judge's detention order because defendant as get-away driver in robbery "has an extremely strong incentive to flee based upon the length of the prison term he faces under

the charges pending against him and the likelihood of conviction"); *see also United States v. Kakande*, No. 1:10–cr–00117–JAW, 2011 WL 1790639, *2 (D. Me. May 9, 2011) ("Generally, the longer the sentence the defendant is facing, the greater the incentive not to appear if released."); *United States v. Almasri*, Crim. A. No. H-07-155, 2007 WL 296480, at *1 (S.D. Tex. Oct. 10, 2007) (finding severity of potential ten-year sentences weighed in favor of detention). The violations of 18 U.S.C. § 793 are punishable by up to ten years' imprisonment for each violation, and the violation of 18 U.S.C. § 1924 is punishable by up to five years' imprisonment.

The Defendant is facing mounting inculpatory evidence, potentially years of incarceration, and the loss of his livelihood. These facts alone are enough to incentivize a criminal defendant to flee. But in a case involving sensitive national defense information, these facts also make the Defendant an attractive candidate for recruitment by a foreign government that would seek to procure, disseminate, and use classified information to its benefit and to the detriment of the United States. Indeed, it has already been widely reported that adversaries of the United States have commented on the information the Defendant posted online. Those same adversaries have every incentive to contact the Defendant, to seek additional information he may have physical access to or knowledge of, and to provide him with the means to help him flee the country in return for that information.

The Defendant's limited means support this concern that he would be susceptible to payment and recruitment by an adversary. As noted in the Pretrial Services Report, prior to arrest, the Defendant's net worth was approximately $19,000—approximately half of which appears to be tied to the value of his guns. If the Defendant is convicted of multiple felonies, the Defendant's ability to find gainful employment after any period of incarceration would be limited. Even if the Defendant's passport is taken away, if an adversary or even an ideological supporter provided the

means and the opportunity to evade the reach of U.S. law, there is nothing to suggest that—like others before him—the Defendant would not accept the opportunity to flee.

The Defendant's risk of flight is further supported by the very nature of his betrayal. When the Defendant joined the U.S. Air National Guard, the Defendant took an oath to support and defend the Constitution of the United States. The Defendant signed multiple non-disclosure agreements with the Air Force. But neither solemn vow nor binding contract was enough to stop the Defendant from serving his own interests. For these reasons, the Government respectfully submits that any conditions imposed by this Court would similarly fail. Put simply, a preponderance of the evidence reflects a serious risk of flight. On this basis alone, the Defendant should be detained.

### D. Nature and Seriousness of the Danger to Any Person or the Community – 18 U.S.C. 3142(g)(4)

#### 1. The Defendant Destroyed Evidence and Tampered with Witnesses Before His Arrest and Is Likely to Continue to Obstruct Justice if Released

As noted above, the Defendant has already tampered with witnesses and has attempted to destroy inculpatory evidence. In so doing, he has exposed himself to additional legal peril. If released, there is nothing to suggest that the Defendant would not continue to destroy evidence, influence witnesses, and otherwise seek to obstruct justice prior to trial. Accordingly—and as contemplated in the Senate Report accompanying the Bail Reform Act—because the Defendant poses a danger to the integrity of this proceeding, the Defendant must be detained.

As discussed above, since multiple media outlets began to report on the unauthorized disclosure of purported classified information on or about April 6, 2023, the Defendant has taken or appears to have taken the following actions to obstruct justice:

- Deleted the social media server where he posted the Government Information;

Case 1:23-cr-10159-IT   Document 19   Filed 04/26/23   Page 13 of 18

- Encouraged others to delete inculpatory evidence;

- Procured a new phone number and email address; and

- Smashed multiple electronic devices and disposed of them in a dumpster.

It appears that the Defendant took these steps with the intent to cover his tracks and to obscure his role in multiple crimes. The government further believes that the Defendant would have no hesitation, if released, to continue in his efforts to obstruct efforts to bring him to justice, facts the Court must weigh in assessing the dangerousness prong of the Bail Reform Act.

The defense has indicated that they will seek release to the home of the Defendant's father. However, the Defendant has proven to be nothing short of deceptive and coercive, exposing others to peril in pursuit of his own freedom. Even if the Defendant's devices are removed from his father's home, his father certainly cannot be expected to spend every moment monitoring his son's access to electronic devices that remain in the home. Moreover, the Defendant's extensive background in computers would aid him in his efforts to hide his access to these devices. The Defendant has received instruction in the fundamentals of information technology, computer system familiarization, network fundamentals, and cyber security. *See* Attachment K, (CCAF Teixeira transcript). Based on this training and his many attempts to obstruct justice to date, the Defendant has not only the means but the motive and the skills to circumvent any potential restrictions of online activity this Court would impose upon him. Accordingly, the government submits that there is clear and convincing evidence to show that the Defendant poses a threat to the integrity of this judicial proceeding. For these reasons, the Defendant must be detained.

### 2. The Defendant is an Ongoing Risk to the National Security of the United States because of the Likelihood of Future Disclosures of Classified National Defense Information

Should he be released, the Defendant poses a direct threat of causing additional exceptionally grave damage to the U.S. national security. Between February 2022 and April 2023, the Defendant viewed hundreds of classified documents, many of which were classified at the Top Secret//Sensitive Compartmented Information level. The Defendant conducted hundreds more keyword searches in an effort to find classified information and even solicited requests from his online friends for specific information. *See* Attachment D. Many of the Defendant's searches related to the Russia-Ukraine conflict. *Id.* The Defendant accessed these documents in what appears to be a deliberate effort to disseminate this country's secrets.

As noted above, in considering the "safety of the community" as expressed in § 3142, the Court should consider more than merely a danger of harm involving physical violence and may consider, for example, a continuing generalized threat of criminal activity. *See United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993). There can be no doubt that protecting the nation's security secrets is of vital importance. As the Supreme Court has noted, "[i]t is 'obvious and unarguable' that *no governmental interest is more compelling* than the security of the Nation," *Haig v. Agee*, 453 U.S. 280, 307 (1981) (emphasis added), which includes the "substantial interest in protecting sensitive sources and methods of gathering information." *United States v. Abu Ali*, 528 F.3d 210, 247 (4th Cir. 2008) (quoting *United States v. Smith*, 780 F.2d 1102, 1108 (4th Cir. 1985).

The information to which the Defendant had access—and did access—far exceeds what has been publicly disclosed on the Internet to date, a fact the Defendant himself acknowledged in a social media chat record from December 2022. In that record, the Defendant stated that he

"omit[s] a decent amount" of information because he was "[n]ot gonna type out 35 pages of information it's just not happening." He went on to state, "I tailor it and take important parts and include as many details as possible." *See* Attachment I.

The Defendant's release of additional national defense information could continue to cause "exceptionally grave damage to the national security." *See* Executive Order 13526, § 1.2(a)(1). Here, the government is still investigating whether and where the Defendant may have retained any physical or digital copies of stolen classified information, including information that has not surfaced publicly. In this effort, the Defendant has a head-start on the government. The Defendant knows where the information is. He knows how to access it. And based on his specialized IT skills, he presumably knows how to disseminate that information without being immediately noticed.

But even if the government were to seize all physical or digital information the Defendant took and disseminated without authorization, the government cannot erase the knowledge the Defendant has acquired by virtue of his access to—and apparent study of—classified information over the course of at least a year. Put simply, there is nothing a court can do to ensure the Defendant's compliance with his conditions of release other than take the Defendant at his word. *See Winner*, 1:17-cr-00034-JRH-BKE, Dkt. 163, at 14; *see also Martin*, 1:17-cr-00069-RDB, Dkt. 24. And the Defendant's history of honoring similar types of agreements is abysmal. There simply is no condition or combination of conditions that can ensure the Defendant will not further disclose additional information still in his knowledge or possession.[6] The damage the Defendant has

---

[6] *See United States v. Tortora*, 922 F. 2d 880, 887 (1st Cir. 1990) ("Given the breadth of human imagination, it will always be possible to envision some set of release conditions which might reasonably assure the safety of the community. For instance, agents could be posted by the government to watch Tortora at all times to ensure that he remains compliant; the guards could search all visitors, dog Tortora's footsteps en route to all appointments, and otherwise act as private jailers. But the Bail Reform Act, as we read it, does not require release of a dangerous defendant if the only combination of conditions that would reasonably assure societal safety consists of heroic measures beyond those which can fairly be said to have been within Congress's contemplation.").

already caused to the U.S. national security is immense. The damage the Defendant is still capable of causing is extraordinary. Detention is necessary to ensure that the Defendant does not continue on his destructive and damaging path.

### 3. The Defendant Poses a Physical Danger to the Community

As discussed above, the Defendant undoubtedly poses a danger to the U.S. at large based on his ability to cause exceptionally grave danger to the U.S. national security. However, there is also evidence to suggest that the Defendant may also pose a physical danger to the community.

The Defendant repeatedly engaged in detailed and troubling discussions about violence and murder on the social media platform where he also posted classified information. *See* Attachment I. Even giving the Defendant the benefit of the doubt and assuming some of his comments were hyperbolic, in 2018, the Defendant's school took his comments about weapons seriously enough to suspend him.

Moreover, as discussed above, the Defendant had multiple weapons just feet from his bed. A search of the Defendant's primary and secondary residences—that of his mother and father— also revealed the existence of a virtual arsenal of weapons, including bolt-action rifles, rifles, AR- and AK-style weapons, and a bazooka. Although the Bureau of Alcohol, Tobacco, and Firearms seized a number of weapons from the Defendant's primary residence, his father's weapons were not seized. And it is his father's home to which the Defendant is asking to be released.

Of additional concern, as discussed in Attachment D, the declaration of FBI Special Agent Luke Church the government is also aware that in July 2022, the Defendant used his government computer to search for the following terms: "Ruby Ridge," "Las Vegas shooting," "Mandalay Bay shooting," "Buffalo tops shooting," and "Uvalde." These searches were not related to the Defendant's position in information technology. While it has been reported in the media that these

searches may have been tied to the Defendant's belief that the government had prior notice of these threats and failed to act, the combination of these search terms, the Defendant's violent statements on social media, and the Defendant's arsenal of weapons is troubling.

The Defendant has already proved himself to be untrustworthy. The Defendant has already proved himself to be a danger to the U.S. national security. And in light of the physical danger posed by the Defendant if released, there is simply no condition or combination of conditions that can be fashioned to adequately address and mitigate the risk posed by his release.

## V.   CONCLUSION

Based upon the foregoing, the government has met its burden to show that no conditions of release will reasonably assure the Defendant's appearance, the safety of any person or the community, or the integrity of this proceeding. Accordingly, the government requests the Court order the Defendant detained prior to trial.

The government further requests that, if the Court is inclined to release the Defendant on conditions, it stay its order for such time as to permit the government to file a motion for revocation of the order of release under 18 U.S.C. § 3145(a).

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

/s/ *Nadine Pellegrini*
NADINE PELLEGRINI
JARED C. DOLAN
JASON CASEY
Assistant United States Attorneys
One Courthouse Way
Boston, MA 02210

>MATTHEW G. OLSEN
>Assistant Attorney General
>
>*/s/ Christina A. Clark*
>CHRISTINA A. CLARK
>Trial Attorney
>National Security Division
>United States Department of Justice
>950 Pennsylvania Ave., NW
>Washington, DC 20530

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

>*/S/ Nadine Pellegrini*
>
>NADINE PELLEGRINI
>Assistant United States Attorney

Date: April 26, 2023