UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Crim. No. 23-cr-10159-IT |
| | ) | |
| v. | ) | |
| | ) | |
| JACK DOUGLAS TEIXEIRA, | ) | |
| | ) | |
| | ) | |
| Defendant. | | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S APPEAL OF MAGISTRATE
JUDGE'S ORDER ON DETENTION**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. iii

I.       Procedural Background.......................................................................................... 2

II.      Factual Background ............................................................................................... 3

         A.      The Defendant's Actions Were Intentional and in Contravention of
                 his Training ................................................................................................. 3

         B.      The Defendant Attempted to Destroy Evidence to Evade Justice ........................ 5

III.     Legal Standard ..................................................................................................... 6

IV.      Argument ............................................................................................................. 7

         A.      The Magistrate Properly Held a Detention Hearing ............................................. 8

         B.      The Court Should Also Find that Conditions Cannot be Fashioned
                 to Reasonably Assure the Safety of the Community ............................................. 9

         C.      There Are No Conditions or Combination of Conditions that Can
                 Reasonably Assure the Appearance of the Defendant at Future
                 Proceedings or the Safety of the Community ....................................................... 10

                 1.      Nature and Circumstances of the Offense Charged – 18
                         U.S.C. § 3142(g)(1) ....................................................................... 11

                 2.      Weight of the Evidence Against the Person – 18 U.S.C.
                         § 3142(g)(2) .................................................................................. 14

                 3.      History and Characteristics of the Person – 18 U.S.C.
                         § 3142(g)(3) .................................................................................. 15

                 4.      Nature and Seriousness of the Danger to Any Person or the
                         Community – 18 U.S.C. § 3142(g)(4) ...................................................... 18

                         i.      The Defendant Destroyed Evidence and Tampered
                                 with Witnesses Before His Arrest and Is Likely to
                                 Continue to Obstruct Justice if Released ........................................ 18

                         ii.     The Defendant is an Ongoing Risk to the National
                                 Security of the United States because of the
                                 Likelihood of Future Disclosures of Classified
                                 National Defense Information........................................................ 18

iii.     The Defendant Poses a Physical Danger to the Community ................................................................. 19

Conclusion ......................................................................................................................... 20

CERTIFICATE OF SERVICE ........................................................................................ 20

# TABLE OF AUTHORITIES

## CASES

*United States v. Acevedo-Ramos*,
   755 F.2d 203 (1st Cir. 1985) .................................................................... 10

*United States v. Edson*,
   487 F.2d 370 (1st Cir. 1973) .................................................................... 11

*United States v. Friedman*,
   837 F.2d 48 (2d Cir. 1988) ....................................................................... 8

*United States v. Gennaco*,
   834 F. Supp. 2d 38 (D. Mass. 2011) ........................................................ 6

*United States v. Lizard-Maldonado*,
   275 F. Supp. 3d 1284 (D. Utah 2017) ...................................................... 9

*United States v. McForbes*,
   109 F. Supp. 3d 365 (D. Mass. 2015) ...................................................... 6

*United States v. Mubarak*,
   2021 WL 242049 (D. Mass. Jan. 25, 2021) ........................................... 6, 7

*United States v. Oliveira*,
   238 F. Supp. 3d 165 (D. Mass. 2017) ...................................................... 7

*United States v. Pierce*,
   107 F. Supp.2d 126 (D. Mass. 2000) ....................................................... 7

*United States v. Ploof*,
   851 F.2d 7 (1st Cir. 1988) ...................................................................... 10

*United States v. Salerno*,
   481 U.S. 739 (1987) ............................................................................... 11

*United States v. Subil*,
   2023 WL 3866709 (W.D. Wash June 7, 2023) ......................................... 9

*United States v. Tortora*,
   922 F.2d 880 (1st Cir. 1990) .............................................................. 12, 13

## STATUTES

18 U.S.C. § 793(e) .................................................................................... 3

18 U.S.C. § 3142 ........................................................................... 10, 12, 15

18 U.S.C. § 3142(e) ................................................................................................................. 9

18 U.S.C. § 3142(f)(2) ............................................................................................................ 9

18 U.S.C. § 3142(f)(2)(a), (b) ................................................................................................ 2

18 U.S.C. § 3142(g) ........................................................................................................... 7, 10

18 U.S.C. § 3142(g)(1) .......................................................................................................... 11

18 U.S.C. § 3142(g)(2) .......................................................................................................... 14

18 U.S.C. § 3142(g)(3) ..................................................................................................... 15, 17

18 U.S.C. § 3142(g)(4) .......................................................................................................... 18

18 U.S.C. § 3145(b) ................................................................................................................ 6

In his motion to revoke Magistrate Judge Hennessy's detention order, Defendant Jack Teixeira asks this Court to set conditions of release based on a fictional version of himself rather than the undeniable reality of the individual he is. At first glance, the façade he presents of a family-oriented, law-abiding Massachusetts resident offers an enticing image. However, the detention proceedings before Magistrate Judge Hennessy shattered that veneer as illusion. This Court should focus on the real Jack Teixeira. The Defendant is accused of and faces overwhelming evidence of having committed one of the largest disclosures of classified national defense information in the history of our nation; provided top-secret information to foreign nationals adjacent to a theater of war; expressed support for a foreign terrorist organization committing a mass-casualty attack at the world's largest sporting event; freely discussed and detailed how he would commit his own acts of violence; engaged in acts of deception and obstruction designed to thwart his own apprehension and prosecution; and lied to and manipulated those around him when it served his interests.

The Defendant's knowledge—and possible continued possession—of government secrets would be exceptionally valuable to many U.S. adversaries. Accordingly, for the reasons set forth in Magistrate Judge Hennessy's Order, the Defendant should be detained as a flight risk. In addition, based on the evidence of the Defendant's obstruction to date and the very real possibility that he will continue to obstruct these proceedings, the Court can and should consider the danger to the community posed by the Defendant, a factor that also supports detention. The Defendant's violent rhetoric combined with an "unhealthy" obsession with firearms, *see* Doc. No. 37 at 16, presents a significant danger to the community. And the Defendant has also shown through his brazen conduct to date that he has no misgivings about endangering the nation by putting at risk

the closely guarded secrets of the United States.  Put simply, there are no conditions of release that can adequately mitigate the risks posed by the Defendant if released by this Court.

## I.        Procedural Background

The Defendant was arrested on April 13, 2023.  The criminal complaint filed on April 14, 2023 provided considerable detail regarding the Defendant's criminal activity in accessing and disseminating classified national defense information.  Doc. No. 3.  An initial appearance was held on April 14, 2023, at which time the government moved for detention pursuant to 18 U.S.C. § 3142(f)(2)(a) and (b).  On April 26, 2023, the government filed its first Supplemental Motion for Detention, which included a statement of proffered facts in support of the government's claim that the Defendant posed a serious risk of flight and that he obstructed justice.  Doc. No. 19.  The Defendant filed a Memorandum in Opposition with five exhibits and did not raise any objection to the exhibits proffered by the government to the court in support of its motion.  Doc. No. 20.  On April 27, 2023, the Magistrate Court heard argument on the issues surrounding detention.  At no time during those proceedings did the Defendant raise the claim that the government was not entitled to a detention hearing.  At the conclusion of the hearing, the Court took the matter under advisement.

The Court subsequently continued the detention determination until May 19, 2023, and permitted both parties to make further submissions. Each party submitted a supplemental memorandum, and the government provided six additional exhibits.  *See* Doc. Nos. 33, 34. On May 19, 2023, Magistrate Judge Hennessy orally granted the government's motion for detention, Doc. No. 36, and on May 22, 2023, he issued a Memorandum and Order on Detention ("the Memorandum").  Doc. No. 37.

On June 15, 2023, a federal grand jury returned an indictment charging the Defendant with six counts of willful retention and transmission of information relating to the national defense in violation of 18 U.S.C. § 793(e).  Doc. No. 48.

## II.     Factual Background

The government's exhibits in support of its detention memoranda before Magistrate Judge Hennessy illustrate many of the salient facts this Court should consider in reaching its decision. However, since making its initial submissions to the Magistrate Court, the government has also uncovered additional inculpatory information regarding both the Defendant's intentions and his conduct that weigh in favor of detention.

### A.  The Defendant's Actions Were Intentional and in Contravention of his Training.

Among the exhibits the government previously submitted were multiple non-disclosure agreements signed by the Defendant (Doc. No. 19-1; Doc. No. 19-2; and Doc. No. 19-3), which specifically advised him of the prohibitions on and consequences of illegally disclosing classified information;[1] two Declarations, which provided details of messages sent by Teixeira to other individuals including one in which the Defendant stated "I hope isis [Islamic State of Iraq] goes through with their attack plan and creates a massacre at the World Cup," Doc. No. 19-8; and another conversation in which he stated he wanted to buy a dodge caravan and "[s]et up an ar [automatic rifle] and sniper blind."  *Id.*   The government also submitted reports of multiple

---

[1] To the extent the Defendant is claiming that his training was somehow defective due to COVID-19 restrictions, *see* Doc. No. 83 at 2, n.1, the opinion of a retired Colonel regarding purported cuts to "the warrior skills" required for "service in the field," are hardly on par with the training the Defendant seemingly purports to lack.  Moreover, there is nothing that supports that lack of training was at the heart of the Defendant's cavalier attitude toward the disclosure of classified information—at one point stating, "Idgaf what they say I can or can't share," *see* Doc. No. 34-1—or the lives of other individuals whose safety he compromised by his failure to comply with basic requirements.

incidents during which the Defendant was advised that he could not take notes on classified information, Doc. No. 34-2, and "to cease-and-desist on any deep dives into classified intelligence." Doc. No. 34-3.

Additional evidence exists that further illustrates the Defendant's intentions with respect to his disclosures of exceptionally sensitive national defense information. Although the defense attempts to minimize the seriousness of Defendant's conduct by making the unsupported assertion that a disclosure of classified national defense information to a group that included teenagers is somehow less harmful, the *scale* and *audacity* with which he shared information—and his persistence in doing so in the face of repeated warnings—leaves no doubt as to the gravity of his conduct and that he made a calculated choice to put his nation's security at risk to advance his own goals and agenda. Compounding these harms is that the Defendant shared classified national defense information with individuals he knew to be outside the United States. For example, the Defendant's chats reflect that, on or around February 20, 2022, days before the Russia-Ukraine war began, the Defendant shared information about refugees entering a specific foreign country with an individual he knew to be from that country, using derogatory language to refer to the refugees:

| | |
|---|---|
| TEIXEIRA: | Yo |
| TEIXEIRA: | You live near [foreign city] yeah? |
| User: | yeah |
| User: | village next to it |
| User: | why ? |
| TEIXEIRA: | Good |
| TEIXEIRA: | There will be a wave of niggers from [city in Ukraine] soon |
| TEIXEIRA: | When it happens |
| User: | so never ? |
| TEIXEIRA: | I'll elaborate more when I get home |
| TEIXEIRA: | [PRESUMPTIVELY CLASSIFIED] |
| TEIXEIRA: | That's what I was told and I did more digging and that's what more and more people are saying |

The Court can take judicial notice that two days after this conversation, Vladimir Putin officially authorized the war, and missile and artillery attacks into Ukraine began.

In addition to those inculpatory conversations, additional physical evidence also definitively ties the Defendant to his crimes.  During the April 2023 search at the Defendant's home, law enforcement agents noted a similarity between the granite kitchen countertop in the Defendant's home and the countertop that was visible in the some of the images that were posted online.  A forensic analysis of the granite countertop in certain of those images, such as the countertop depicted in Doc. No. 86-1, was found to match the countertop that was observed in the Defendant's home.  *See* Doc. No. 86-2; *see also* Doc. No. 86-3, Declaration of FBI Agent Luke Church.

**B.      The Defendant Attempted to Destroy Evidence to Evade Justice.**

Evidence of the Defendant's actions to obstruct this investigation and hide evidence of his guilt is also overwhelming.  As described in its prior submission, the government located multiple electronic devices in the dumpster.  Among those items was an iPad that was destroyed in such a way that the FBI believes data recovery is improbable, if not impossible.  *See* Doc. No. 86-3.  The remnants of a computer tower—primarily the outer shell of the tower, including the fans—were also located in the dumpster, but the electronic components of the tower that would store data, such as the hard drive, had been removed and have not been located.  *See* Doc. No 86-3.  The government also located additional electronics in the dumpster, including an Xbox and a laptop, and although these also initially appeared to have been smashed, the government now believes these were merely disposed of.  Notably, however, the laptop's hard drive had been factory reset and did not contain any data.

In addition to destroying and/or disposing of his physical devices, the Defendant also attempted to delete a trail of electronic evidence. Moments after he learned the information he posted had been disseminated beyond the original social media site, the Defendant immediately changed his username and password and subsequently deleted his entire social media account— but not before he encouraged others to delete any information implicating him in his crimes.[2]

Rather than focus on these facts or his underlying conduct, the Defendant instead presents the Court with a mirage of a Massachusetts family-man who was the victim of another user's further dissemination of the classified national defense information the Defendant illegally transmitted. However, the Defendant's selective and misleading narrative does nothing to undermine the facts supporting Magistrate Judge Hennessy's original detention decision.

## III.   Legal Standard

Pursuant to 18 U.S.C. § 3145(b), a person ordered detained by a magistrate judge "may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the detention order." This Court, as the court of "original jurisdiction," conducts de novo review of a contested detention order. *See United States v. Gennaco*, 834 F. Supp. 2d 38, 40 (D. Mass. 2011) (Gorton, J.). "Where . . . a court examines the detention order without taking new evidence, a degree of deference to the factual determinations of the Magistrate tempers the independent review." *United States v. Mubarak*, 2021 WL 242049, at *3 (D. Mass. Jan. 25, 2021) (Burroughs, J.) (quoting *United States v. McForbes*, 109 F. Supp. 3d 365, 367 n.2 (D. Mass. 2015)

---

[2] For example, on April 7, 2023, the Defendant requested another participant delete all conversations stored in the server, stating, "ban me and delete all messages." When that user told him that "it only goes to past 7 days," The Defendant's response was, "[f]uck ALR nvm [alright, never mind] . . . Just find stuff from Feb 2022 in civil discussion and delete it during your free time." He also told that user, "if anyone comes looking, don't tell them shit," and he asked the user to pass this message on to others. Doc No.19-8.

(Hillman, J.)).  The Court may reject the magistrate judge's fact finding and start the hearing anew or may accept the findings of fact made by the magistrate and hear additional facts and argument. *United States v. Oliveira*, 238 F. Supp. 3d 165, 167 (D. Mass. 2017).  A district court may take additional evidence or conduct a new evidentiary hearing when appropriate; however, the defendant is not entitled to a hearing as a matter of right.  *See Mubarak*, 2021 WL 242049, at *3 (citing *United States v. Pierce*, 107 F. Supp.2d 126, 127 (D. Mass. 2000) (Gorton, J.) (stating that "[s]ection 3145(b) of Title 18 does not provide for a hearing as a matter of right")).

In determining whether any conditions of release will reasonably assure the Defendant's appearance and the safety of any other person and the community, the Court must consider the factors set forth in 18 U.S.C. § 3142(g), which include: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger that the defendant's release would pose to any other person or the community.

## IV.    Argument

Notwithstanding the lapse of more than two months and two submissions that comprise his appeal, the Defendant has failed to address, in even a cursory fashion, the actions and attitudes that were troubling enough to Magistrate Judge Hennessy that they resulted in the Defendant's pretrial detention.  Tellingly, the Defendant provides no explanation as to why he: (i) continued to access classified national defense information outside the scope of his duties after being admonished multiple times not to do so; (ii) deleted classified national defense information from the social media channel where he posted it; (iii) deleted his entire social media account when the classified national defense information he posted proliferated across the Internet; (iv) advised others to delete any messages, texts, or images that he had posted; and (v) disposed of—telling one colleague that

his phone had flown out his car window and been run over by a truck—or destroyed multiple electronic devices.  The Defendant offers no explanation because the only explanation is that the Defendant was attempting to obstruct justice.

The Defendant also fails to offer any explanation for what the Magistrate Judge described as the "absence of remorse, of regret, of 'Integrity First'" and makes no attempt to disagree with the determination that the Defendant's actions smacked of "every man for himself."  Doc. No. 37 at 18.  Instead of addressing Magistrate Judge Hennessy's concerns or explaining his actions, the Defendant attempts to minimize the seriousness of his own conduct by drawing false equivalencies to other cases involving classified national defense information.  However, these strained comparisons fall apart with even the slightest scrutiny and ignore the individual circumstances of the Defendant and the conduct that Magistrate Judge Hennessy carefully considered in his ruling.  Those particular facts and circumstances make clear that there are no conditions of release that will reasonably assure the Defendant's future appearance at court proceedings or the safety of the community.  For these reasons, the Defendant should remain detained.

### A.  The Magistrate Properly Held a Detention Hearing.

That the Defendant's opening salvo is that the government is not entitled to a detention hearing that has already occurred is indicative of the paucity of the Defendant's arguments on the merits.  Doc. No. 83 at 8.  The Defendant made no objection to the hearing at the time the Magistrate Judge scheduled it; he did not object to the hearing when it was held; and he participated in the hearing by submitting multiple filings and presenting a witness.[3]  He cannot now be heard

---

[3] Defendant's reliance upon *United States v. Friedman*, 837 F.2d 48 (2d Cir. 1988) is misplaced.  In *Friedman*, the Court of Appeals found that the district court's order contained "only implicit findings relating to the risk of flight," 837 F.2d at 49, which were not sufficiently detailed to support the finding.  Here, the Magistrate Judge explicitly stated that he found "the United States has proved by a preponderance of the evidence that no condition or combination of conditions

to complain that a hearing should not have been held. *See United States v. Subil*, 2023 WL 3866709, at * 5 (W.D. Wash June 7, 2023) ("Despite this and as previously noted, defense counsel did not object to the court's hearing order, nor did counsel otherwise oppose the Government's motion at the arraignment. Therefore, the Court finds that Mr. Subil waived his right to object to the detention hearing."); *United States v. Lizard-Maldonado*, 275 F. Supp. 3d 1284, 1289 (D. Utah 2017) ("This Court finds [defendant] cannot now contest the [Government's] right to a detention hearing after previously submitting to the hearing and not contesting the basis for the hearing.").

Under 18 U.S.C. § 3142(f)(2), the government properly requested and, through multiple filings, provided a more than ample factual basis as to both prongs of § 3142(f)(2) to justify the Magistrate Judge's determination to hold a detention hearing. Nothing more was required.

## B. The Court Should Also Find that Conditions Cannot be Fashioned to Reasonably Assure the Safety of the Community.

At the conclusion of the detention proceedings, Magistrate Judge Hennessy ultimately found that one of the factors supporting detention was the unacceptable risk that the Defendant would obstruct justice. Magistrate Judge Hennessy recognized that obstruction of justice was not listed as one of the considerations described in 18 U.S.C. § 3142(e). However, expressly relying on cases in both the District of Massachusetts and the First Circuit, Magistrate Judge Hennessy found that the Defendant's future obstruction risk was an independent ground upon which the Defendant could be detained. Despite the matter being fully briefed over multiple submissions, the Defendant did not object to that legal finding.

---

will reasonably address the serious risk of flight and obstruction of justice posed by Defendant's release on conditions," making numerous references to evidence in the record before him regarding specific acts committed by the Defendant and statements made by the Defendant in support of the Magistrate Judge's finding. *See* Doc. No. 37 at 22.

Now, the Defendant claims as a matter of law that he cannot be detained based solely on a serious risk that he would obstruct justice.  The law on this point is not nearly as straightforward as the Defendant suggests.  The First Circuit has clearly stated that obstruction of justice is a basis for detention.  *See United States v. Acevedo-Ramos*, 755 F.2d 203, 207-09 (1st Cir. 1985) ("[W]here the court finds that a defendant's release creates an unusual risk of obstruction of justice, the Constitution and relevant statutes permit detention.").   The main case relied upon by the Defendant, *United States v. Ploof*, expressly cited *Acevedo-Ramos* as standing for exactly that proposition.  851 F.2d 7, 12 (1st Cir. 1988).  But, as the Defendant points out, the court in *Ploof* also engaged in a two-step analysis and directed the district court on remand to make further findings as to whether conditions could be fashioned to reasonably assure the safety of the community.  *Id.*

In considering the risk of obstruction, the Court should follow the procedure expressly set forth in *Ploof*.  As discussed in greater detail below, based on the Defendant's obstructive record to date, the Defendant's online vitriol, and the risk that the Defendant's continued knowledge of and potential access to information that threatens the security of the nation, the Court should find, by clear and convincing evidence, "that no condition or combination of conditions will reasonably assure the safety of any other person and the community."  18 U.S.C. § 3142.

**C. There Are No Conditions or Combination of Conditions that Can Reasonably Assure the Appearance of the Defendant at Future Proceedings or the Safety of the Community.**

Like Magistrate Judge Hennessy, this Court's review must ultimately focus on whether conditions can be fashioned to reasonably assure both the Defendant's future appearance at trial and the safety of the community based on the factors set out in 18 U.S.C. § 3142(g).

### 1. *Nature and Circumstances of the Offense Charged – 18 U.S.C. § 3142(g)(1)*

First, the seriousness of the offense supports detention.[4]   The Defendant is currently charged in a six-count indictment with the unauthorized disclosure of national defense information, most of which is classified at the Top Secret level.   By definition, the disclosure of Top Secret information can reasonably be expected to cause exceptionally grave damage to the U.S. national security.   But the Defendant's actions transcend legal definition in their practical effects.   Indeed, through the disclosure of a trove of classified national defense information over the course of at least a year, "there is reason to believe [the Defendant] placed at risk men and women in our armed services, civilians and soldiers in Ukraine and elsewhere, doctors and medical professionals providing humanitarian aid, and the list goes on."   Doc. No. 37 at 9.

The Defendant tries to downplay the seriousness of his crime by repeating factual arguments that are directly contradicted by the record.   For example, the Defendant claims that he did not intend for the documents he posted online to become widely available.   Doc. No. 83 at 17. Beyond the absurdity of claiming that he did not intend to publicize Top Secret information that he publicly posted on the Internet, the Defendant's "private online community" contained at least 150 individuals, including those believed to be foreign nationals.   Doc. No. 37 at 2-3.   Moreover, during the period of time in which the Defendant was actively searching for and posting classified information on the social media site, the Defendant signed an Information Systems Acceptable

---

[4] Despite the plain language of the statute, the Defendant claims that the Court cannot consider the seriousness of the offense in determining whether pretrial detention is justified.   Doc. 83 at 20.   In support, the Defendant cites one case, *United States v. Edson*, 487 F.2d 370 (1st Cir. 1973).   The Defendant fails to explain the applicability of a case from fifty years ago before Congress substantially changed the law applicable to bail decisions in 1984.   *See generally*, *United States v. Salerno*, 481 U.S. 739 (1987) ("By providing for sweeping changes in both the way federal courts consider bail applications and the circumstances under which bail is granted, Congress hoped to give the courts adequate authority to make release decision that give appropriate recognition to the danger a person may pose if released.") (internal marks omitted).

Use Policy and User Agreement, which stated, "I **will not** post sensitive systems, intelligence, or other non-public information from JWICS to **ANY** social media site which would allow unauthorized entities to obtain information that I am not authorized to disseminate that can possibly be exploited." *See* Doc. No. 86-4 (emphasis in original). The Defendant knew his conduct was wrong and that it was illegal. Regardless of the Defendant's claim that he intended the documents to remain available only to limited group of social media users, the nature and circumstances of the offense do not change: the Defendant publicly posted highly classified national defense information, which the Defendant had no way to prevent from further disseminating, across the Internet. There is simply no argument that the Defendant is somehow less culpable because it was more widely disseminated than he hoped.

To avoid any meaningful discussion of the nature and circumstances of the offense, the Defendant attempts to distract the Court by making comparisons to other matters involving other defendants. Doc. No. 83 at 19. His efforts to inject those other matters into this detention proceeding cannot be squared with the well-established principle that the decision whether to detain a defendant is an individualized assessment based on the factors set out in 18 U.S.C. § 3142—and as the Magistrate Judge found, those statutory factors weigh strongly in favor of the Defendant's continued detention.

In *United States v. Tortora*, the First Circuit wrote that "[d]etention determinations must be made individually and, in the final analysis, must be based on the evidence which is before the court regarding the particular defendant. . . . The inquiry is fact bound. No two defendants are likely to have the same pedigree or to occupy the same position." 922 F.2d 880, 888 (1st Cir. 1990). Here, in keeping with the First Circuit's decision in *Tortora*, Magistrate Judge Hennessy properly found that the "success of release on bail depends on a defendant honoring his word."

12

Doc. No. 37 at 16. While the Defendant has suggested various restrictions to the Court, all his proposed restrictions miss the mark because each requires compliance by this Defendant, a fact that was not lost on Magistrate Judge Hennessy. As he aptly observed, there is little in the personal history of the Defendant—an individual who broke his oath to the United States, disregarded multiple reprimands regarding his mishandling of classified information, and who destroyed evidence of his crimes prior to arrest—that supports compliance with rules and regulations.[5] The Court of Appeals in *Tortora* could have been addressing the Defendant when it wrote, "[i]f past is prologue, then promises to hew the straight and narrow will mean next to nothing to this defendant." *Id.* at 887.

After engaging in misleading comparisons, the Defendant also claims that the government has not shown that the Defendant "would be willing to aid a foreign government to the detriment of the United States" or that he "shared national security information with the intent to harm the United States or benefit a foreign adversary." Doc. No. 83 at 10. As a result, the Defendant posits there is nothing to suggest he might now engage with a foreign adversary. But at the detention hearing, Magistrate Judge Hennessy took a more forward-looking view, noting the seriousness of the charges the Defendant faces and stating that the Defendant, who possesses "extremely relevant and perhaps valuable" information on the Russia-Ukraine war, Doc. No. 24 at 33, "is in a slightly different position than any other person who has access to top-secret information, because he has

---

[5] Astoundingly, the Defendant argues that his family is "reasonably capable" of monitoring the Defendant to ensure that he does not engage in "espionage from his childhood bedroom." Doc. No. 83 at 18. However, that argument conveniently ignores that the Defendant engaged in *multiple* acts of espionage from a military base—undaunted by the security systems he knew were in place to safeguard classified information—from his childhood bedroom, from his family kitchen, and presumably from other locations around his house for nearly a year without detection. That this Defendant could now be expected to comply with a set of Court-imposed restrictions largely unsupervised while his father is an hour away at work strains credulity.

already demonstrated that he is prepared to disclose it." *Id.* at 34.  And as to whether he intended to harm the United States, Magistrate Judge Hennessy noted that "there is little possibility Defendant disclosed national defense information under an innocent and mistaken belief that such a disclosure was legal and authorized."  Rather, the Defendant's "alleged efforts to hide his actions confirm his understanding of the illegality of his conduct."  Doc. No. 37 at 8.  The Defendant "was aware his disclosures could harm the United States. . . . purposefully ignored" the risk to the United States, and "participated in a profound breach of his loyalty to the United States."  *Id.* at 9.

For all the reasons discussed above, the nature and circumstances of the offense weigh in favor of detention.

### 2.   *Weight of the Evidence Against the Person – 18 U.S.C. § 3142(g)(2)*

The Bail Reform Act states that the Court should consider the weight of the evidence in determining whether conditions of release can be fashioned.   18 U.S.C. § 3142(g)(2).   The Defendant would have the Court ignore the weight of the evidence because it is overwhelming.  However, as Magistrate Judge Hennessy found, there is no basis in the law of the First Circuit to ignore or discount this factor.  Doc. No. 37 at 14.

The forensic evidence against the Defendant is voluminous and compelling.  That evidence includes recorded videos of the Defendant accessing, reviewing, and printing certain of the charged documents and information from his Air Force workstation on the same day that the Defendant posted the classified information to the social media platform.  *See* Doc. No. 86-3.  The evidence also includes records of searches the Defendant made on his government computer, audit logs reflecting that the Defendant accessed and/or printed each of the charged documents or information, multiple admissions by the Defendant to transmitting classified information, and

requests to others once his conduct became public to delete information tying him to the crime. The forensic evidence is incontrovertibly strong.

In the face of this overwhelming evidence, the Defendant feebly suggests that a crime with a ten-year maximum penalty—notwithstanding the fact there are six counts of that crime—is not sufficiently serious to incentivize the Defendant to flee. However, the § 3142 sentencing factors exist precisely because it is impossible for a court to intuit the true intentions—now or months from now—of a criminal defendant. And as Magistrate Judge Hennessy noted, "[i]f you have a very strong case and you have somebody facing jail, it makes the prospect of jail that much more of a reality than a weak case does." Doc. No. 24 at 42. Accordingly, the weight of the evidence is "squarely relevant" and weighs in favor of detention. *Id.*

### 3. History and Characteristics of the Person – 18 U.S.C. § 3142(g)(3)

In attacking Magistrate Judge Hennessy's Order, the Defendant continues to focus on his *prior* decision not to flee from prosecution. However, when Judge Hennessy weighed the history and characteristics of the Defendant, he accepted the Defendant's proffer that, in that instance, the Defendant returned home and did not flee after his conduct surfaced. Doc No. 37 at 18. The government has never challenged this proffer, and it remains one of the few factors that weigh in the Defendant's favor.

Nevertheless, the Defendant submitted a heavily excerpted, supplemental memorandum that does little more than restate that the Defendant could have fled and even had discussions with his online compatriots about fleeing, but ultimately chose not to do so before being arrested—a fact that was already known to the Magistrate Judge. *See* Doc. No. 80. The Defendant references these conversations as if they are a revelation; however, the Defendant was himself a participant in these conversations. Further, the Defendant knew that the individual with whom he discussed

fleeing the country was a juvenile.  That the Defendant did not accept the alleged offer to abscond abroad with the assistance of a teenager *before being arrested* hardly provides reassurance that he would not accept such assistance from a more sophisticated actor to flee now, after having been charged and while facing extensive evidence of his guilt.[6]

Put simply, the Defendant's argument is a red herring.[7]  Pre-arrest flight was not the concern of the government, and the government does not dispute that the Defendant did not flee in the days leading up to his arrest.  Instead, the Defendant used those precious days to destroy evidence, to hide his trail of criminal activity, and to urge anyone who would listen not to speak to government agents and to destroy anything traceable to him.  The government's concern continues to be that the Defendant will exchange his wealth of knowledge (and any information he did not destroy) for his freedom, or, in the alternative, that the Defendant will continue on his destructive, obstructive, and potentially dangerous path if released.

As the government noted in its original submission, on or about April 6, 2023, moments after being made aware that the materials he posted on the social media site were being disseminated, the Defendant began taking action to cover his tracks:

> User: i think your thingies got passed along
> User: seeing pro rus telegram with them
> TEIXEIRA: Which ones?
> User: i screenshotted one can i send?
> TEIXEIRA: Sure
> ...
> User: is it actually one of them btw?

---

[6] Additionally, the Defendant omits many key facts from the interview, a copy of which we are requesting permission to file with the Court under seal because of the individual's age.

[7] The Defendant's argument about having friends who are willing to help him evade the law also cuts both ways.  For example, there is nothing to suggest that, if they were willing to help him flee, one of these individuals would not be inclined to find a way to help the Defendant communicate with the outside world during a period of home detention.  That the Defendant's father monitors Wi-Fi would not stop the Defendant from accessing an internet provider's mobile network from a covertly provided mobile device.

> TEIXEIRA: Not commenting
> User: aight
> User: ima delete it too
> User: did you share them outside of abis?
> TEIXEIRA: I think I'm done talking about this
> User: ok
> TEIXEIRA: Permanently
> User: sorry if I pushed you here
> TEIXEIRA: It's fine
> TEIXEIRA: Just letting u know I'm leaving the server
> TEIXEIRA: Don't make a huge deal of it

*See* Doc. No. 19-8.  Within minutes of receiving this message, the Defendant received a password reset link from the social media site followed by a password changed email.  Both are indications that the Defendant requested the new password for the site.  The Defendant changed his account username several minutes later.[8]

In addition, as reflected by the stack of documents in Doc. No. 86-1, the Defendant possessed significant amounts of what is purportedly classified national defense information at his home.  The government did not recover any of the hard copy documents that the Defendant accessed and printed and appears to have photographed in his home during a search of his residence.  Although the government cannot pinpoint the exact date that the Defendant disposed of, stashed, or destroyed these documents, in light of the Defendant's destructive behavior in the days before his arrest, it is not unreasonable to infer that the Defendant used those days to destroy not only digital evidence, but also much of the physical evidence linking him to his crimes.

These are all factors that the Court must consider in assessing the Defendant's "present character" and "past conduct" under 3142(g)(3).  Contrary to the Defendant's arguments, the Defendant's decision not to flee was not made out of observance of U.S. law or some sense of

---

[8] One day later, the same day the Defendant told another user to "delete all messages," the Defendant again changed his account username and his profile picture.

newly discovered moral righteousness.  He did not flee because he was taking every step he could to hide his trail—to destroy the very evidence that could be used against him in proceedings such as those before this Court.  Accordingly, the Defendant's history and characteristics weigh in favor of detention.

### 4. *Nature and Seriousness of the Danger to Any Person or the Community – 18 U.S.C. § 3142(g)(4)*

#### i. The Defendant Destroyed Evidence and Tampered with Witnesses Before His Arrest and Is Likely to Continue to Obstruct Justice if Released.

As discussed above, the Defendant's efforts to obstruct justice were significant.  The Defendant does not contend otherwise.  Instead, the Defendant essentially argues that there is nothing left to obstruct because the government seized all the Defendant's electronic devices—or at least those that did not fly out the window of his truck—from his home.  *See* Doc. No.  83 at 11.  But as the Defendant well knows, the government has not yet found the originals of any of the hundreds of documents the Defendant printed and took from Otis Air Force Base, many of which were Top Secret, and many of which the Defendant posted online.  Additionally, with two exceptions—the government located two classified documents in an account associated with the Defendant—the government has not determined where the Defendant stored electronic copies of those documents.  The Defendant's continued possession and storage of this information would present the Defendant with a powerful incentive to finish what he started.

#### ii. The Defendant is an Ongoing Risk to the National Security of the United States because of the Likelihood of Future Disclosures of Classified National Defense Information.

Beyond the risk posed to the integrity of these proceedings, the national security of the United States would face even greater jeopardy should the Defendant be released.  The Russia-Ukraine war is an ongoing global security threat.  Foreign nations, including adversaries of the United States, want to know what the Defendant remembers or possibly still possesses.  The Defendant's argument that he could not

flee focuses on the resources that would be available to the Defendant on pretrial release, but that is not the government's concern.  The government is concerned about the resources available to a multitude of foreign adversaries that want what the Defendant possesses or knows.  For the present purposes, those resources are effectively limitless.

The Defendant is responsible for one of the largest leaks of classified information in United States history and, in that regard, will be known in the same breath as Edward Snowden. Magistrate Judge Hennessy concluded that "[g]iven this landscape, an overture to Defendant, were he released, hardly seems implausible, and a willingness to listen by someone in Defendant's difficult circumstances poses an unacceptable threat to U.S. national security."  *Id.*  Accordingly, as Judge Hennessy correctly acknowledged, the Defendant's continued access to Top Secret national defense information—whether based on recall or on information he has hidden away— relates to the safety of us all.  *See* Doc. No. 37 at 19.

iii.    The Defendant Poses a Physical Danger to the Community.

In its motion before Magistrate Judge Hennessy, the government submitted substantial evidence that the Defendant is a physical danger to the community.  The Defendant repeatedly engaged in detailed and troubling discussions about violence and murder on the social media platform where he also posted classified information.  *See* Doc. No. 19-8.  The Defendant does not deny making comments in support of a mass casualty attack by a foreign terrorist organization, does not deny discussing how he would cull the weak minded through mass murder, and does not deny detailed discussions about how to turn a car into an "assassination van," to target people in a "crowded urban or suburban environment."  *Id.*  Instead, he claims that these statements (and others like them) "lack important context."  Doc. No. 83 at 26.  On this point, the government agrees with the Defendant.  Because when you pair the Defendant's statements with the real context—his

"unhealthy" fascination with other mass shooters in Las Vegas, Uvalde, and Buffalo—his statements become even more chilling.  *See* Doc. No. 37 at 16; *see also* Doc. No. 19-4.

As Magistrate Judge Hennessy noted, the Defendant's messages reflect "hostility, even hatred," and the "specifics of planning."  *Id.* at 20.  The Defendant's dangerous words compound the risk of flight and obstruction by adding a layer of violent, physical harm to the calculus. Accordingly, when considered in the full context of the Defendant's untrustworthy and self-serving behavior, the danger to the community also weighs in favor of detention.

**Conclusion**

The Court should deny the Defendant's motion to revoke the detention order.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

/s/ *Nadine Pellegrini*
NADINE PELLEGRINI
JARED C. DOLAN
JASON CASEY
Assistant United States Attorneys

MATTHEW G. OLSEN
Assistant Attorney General

/s/ *Christina A. Clark*
CHRISTINA A. CLARK
Trial Attorney
National Security Division

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/S/ Nadine Pellegrini*
NADINE PELLEGRINI
Assistant United States Attorney

Date: August 4, 2023

20