UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:23-cr-10159-IT |
| | ) | |
| JACK DOUGLAS TEIXEIRA | ) | |

**DEFENDANT JACK DOUGLAS TEIXEIRA'S
SENTENCING MEMORANDUM**

Brendan Kelley
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
brendan_kelley@fd.org

Michael K. Bachrach
Law Office of Michael K. Bachrach
224 West 30th Street, Suite 302
New York, New York 10001
(212) 929-0592
michael@mbachlaw.com

Dated: October 29, 2024          *Attorneys for Defendant Jack Douglas Teixeira*

## **Table of Contents**

sI.      Preliminary Statement......................................................................................1

II.      Who is Jack Teixeira?.....................................................................................3

     A.      Context Matters: Jack's decisions were impacted by his limitations ....................3

     B.      Family History and Early Childhood .....................................................7

     C.      Middle School ..................................................................................14

     D.      Adolescence, High School Life, and Increased Social Struggles .........................15

     E.      Military and Continued Social Struggles .................................................20

     F.      Firearms ............................................................................................25

     G.      COVID, Social Isolation, and Finding an Online Community ............................27

     H.      Autism Spectrum Disorder ....................................................................34

     I.      Emerging Adulthood............................................................................41

III.     Defendant's Guidelines Range ......................................................................45

IV.      Additional Section 3553(a) Factors ................................................................46

     A.      Seriousness of the Offense and Characteristics of Mr. Teixeira............................46

     B.      Deterrence ...........................................................................................51

     C.      Protection ............................................................................................52

     D.      The Need to Avoid Unwarranted Sentence Disparities .........................................53

V.      Conclusion .....................................................................................................54

## I.  **Preliminary Statement**

Jack Teixeira is 22 years old.  He is autistic and was isolated.  His world was online—

playing video games, posting memes, making deep friendships he could never make in high school.

He had just turned 20 years old when he began sharing classified information with his friends on

Discord and was still only 21 when he was arrested.  His intent was never to harm the United

States.  Instead, his intent was to educate his friends about world events to make certain they were

not misled by misinformation.  To Jack, the Ukraine war was his generation's World War II or

Iraq, and he needed someone to share the experience with.  In his own words:

> So, for a long time in my life, I hadn't really seen – life kinda felt
> like the same thing.  Day in, day out, everyone just doing their own
> thing.  And I looked back to the baby-boomers.  I looked back to my
> parents, where they had the gulf war; they had Afghanistan.  They
> had the invasion of Iraq.  They had operation Just Cause in Panama.
> They had, um, the collapse of the Soviet Union.  They had these
> world-changing events that happened, and meanwhile my
> generation has the Global War on Terror.  But that's been going on
> for 20 years, and it's the same thing of going to some place, get shot
> at a little bit, return fire, and then we return and write a bunch of
> memos about it.  To me, that wasn't a war. So finally seeing a proper
> land war happen, not just some two small back-water third-world
> countries going at it.  Not like a civil war in some other country –
> this was a real war between two incredibly powerful countries.  I
> thought this was like, an incredibility important event.  So I wanted
> to know as much about it as possible because I thought it was
> probably the most --- probably the biggest event or thing that
> happened in my generation's history.  And we're gonna look back
> and say, "Hey, remember when this happened?" And, "Remember
> all the times of when it happened, what it was like to live through
> that" – kind of like people look back on World War II or the 90s.

Audio of Intelligence Community Debrief of Defendant Jack Teixeira, dated, February 28, 2024

(hereinafter cited as, "Debrief") at 43:02 – 44:32.[1]

---

[1]     The defendant's Plea Agreement, dated, February 28, 2024, at 3, required the defendant to,
"participate in a satisfactory debrief with members of the Intelligence Community, the Department
of Defense, and/or the Department of Justice regarding the offense of conviction and all relevant

Emotionally, Jack was and is severely stunted by his disabilities; barely older than his teenage friends, he made a terrible decision, which he repeated over 14 months. It's a crime that deserves serious consequences. Jack has thoroughly accepted responsibility for the wrongfulness of his actions and stands ready to accept whatever punishment must now be imposed. Indeed, Jack's acceptance goes beyond merely his guilty plea and allocution. He sat for a nearly four-hour intelligence community debrief wherein he detailed the full scope of his conduct and willingly and voluntarily answered every question asked of him by the Government. During his debrief and subsequently through counsel, he has expressed his willingness to answer any additional questions about his conduct from any intelligence agency unable to attend the debrief and consented to the recording of the meeting so that it could be shared with those agencies. Through his military counsel, he is also in the process of negotiating a disposition to his parallel but related military prosecution. Moreover, his rationale for committing these crimes was not disputed by the Government at the debrief or, as of this writing, ever since. His conduct was clearly wrong and misguided, but his motives and decisions were naïve, not nefarious.

Title 18, United States Code, Section 3553(a), requires this Court to consider Jack Teixeira's personal history, background, and all of the facts underlying this case, and to incorporate those considerations when determining his sentence. When doing so, we respectfully submit that a sentence of 132 months' imprisonment would be just and appropriate, and that no greater sentence is necessary to satisfy the purposes of sentencing.[2]

---

conduct." The Debrief was recorded by the Government with the consent of the defense. Quotes to the Debrief herein are as transcribed by defense counsel. A copy of the audio recording itself, can be provided to the Court upon request.

[2]    This sentencing memorandum is based upon interviews conducted by the defendant's mitigation specialist, Anna Bulkin, and/or the undersigned counsel of the following individuals: Jack Douglas Teixeira (the defendant), Dawn Dufault (the defendant's mother), Jack Michael

II.      <u>Who is Jack Teixeira?</u>[3]

A.      <u>Context Matters: Jack's decisions were impacted by his limitations</u>

Any understanding of who Jack Douglas Teixeira truly *is* must begin with recognition of his disabilities.  Once those disabilities are understood, his conduct – both good and bad – take on a different light than an individual not burdened with the same limitations.

As stated succinctly by Dr. Elizabeth Roberts and as discussed further in her detailed report, "Jack is autistic."  Diagnostic Assessment of Dr. Elizabeth V. Roberts, dated, September

---

Teixeira (the defendant's father), Danielle Curtis (the defendant's sister), Thomas (Tom) Dufault (the defendant's stepfather), Duncan Tarver (a childhood friend of the defendant), Michelle Tarver (Duncan Tarver's mother), Aaron Tarver (Duncan Tarver's father), Noah Salinas (also known by his screen name, "Lucca") (an online friend), "Crow" (an online friend/ex-girlfriend), and "Innawoods" (an online/real life friend).  The real names of the defendant's online friends can be provided to this Court upon request.

This report is also based upon a review of the following documents, any or all of which can be provided to the Court upon request: Dighton-Rehoboth School District records; Sturdy Health Primary Care records; South East Center records, Basic Military Training Student Performance Summary - Air National Guard; United Behavioral Health Visit Authorization; Commonwealth of Massachusetts - Firearms Records Bureau; Dr. Richard W. Ober patient files for defendant; Dighton Police Department incident report, dated, March 27, 2018; the defendant's License to Carry Application, Approval Letter, and Suspension Letter; the defendant's Firearms Identification Applications, dated, January 27, 2019, and November 15, 2020; Air University - Community College of the Air Force Transcript; UMass Lowell Transcript; Department of Defense Medical Records; and Plymouth County House of Corrections records.  This report is also based upon the expert report of Dr. Elizabeth V. Roberts, PsyD (annexed hereto as, "Exhibit A") (filed under seal), letters submitted for this Court's consideration by Jack's family and friends (annexed hereto as, "Exhibit B"), and other sources cited herein.

A classified supplement to this Sentencing Memorandum will be filed under separate cover addressing additional issues.

[3]      For ease of the reader, Jack Douglas Teixeira will be referred to as "Jack," while his father, Jack Michael Teixeira, will be referred to as "Jack Sr." though he is not formally named as such.  The family also commonly refers to him as "Big Jack."  No disrespect is meant towards the defendant, his family, or this Court, through counsels' use of first names.

24, 2024 (annexed here to as, "Exhibit A") (filed under seal), at 35.[4]  "[H]indsight is crystal clear that Jack's significant limitations in social development emerged well before age 5, have persisted and evolved across development, with repeated failures to make and keep friends across his educational career and more recently, in the workplace."  *Id.*  "He has been immersed in narrow, repetitive interests since age 2, beginning with cars, and segueing into aircraft, and ultimately weaponry, guns, and military and military history topics."  *Id.*

"Like the majority of autistic individuals, Jack has several co-occurring conditions that have further handicapped him across development." *Id.*  "ADHD was identified early on," but "his tic disorder and associated obsessions and compulsions were, like his autism spectrum condition, missed."  *Id.* As a result, "Jack did not get the help he needed across development and in the transition from school to the workplace.  Because he was not diagnosed and did not receive the interventions and treatments he required, his limitations became entrenched and his social development stalled. This set the stage for a poor adjustment to his first job and his unlawful choices…." *Id.*

A discussion of Jack's disabilities and limitations is not in any way intended to minimize Jack's understanding of the wrongfulness of his conduct, his intent to commit these crimes, and the potential harm that could have resulted.  As Dr. Roberts's notes, "Jack has pleaded guilty to serious offenses.  He takes responsibility for his actions."  *Id.*  A recognition of the limitations of Jack's decision-making skills as a result of his co-occurring autism and ADHD, gives critical

---

[4]      With the defendant's permission, we are including limited quotes from Dr. Roberts's report in this publicly filed brief.  Consistent with this Court's Order, dated, October 29, 2024 (Dkt. No. 141), a complete copy of the report is being filing under seal.

context to his crimes and, in our opinion, mitigates the level of punishment that is appropriate for this defendant in this case.

As discussed elsewhere in this memorandum, Jack's intent was *not* to harm the United States or its interests, Jack's intent was merely to share with a small group of friends the experiences that he was going through – his passion, his interests, and his understanding of the truth – addled by a misplaced belief that his friends could be trusted and couldn't possibly be someone other than they claimed.

As Dr. Roberts's explained:

> Autism-related factors set the stage for the choices Jack made, and these include pronounced rigid thinking around the imperative to "tell the truth" to his online community, which superceded all other considerations including his own non-disclosure agreement with the United States government, intense obsessionality around these topics resulting in all-consuming, obsessional collecting of information, and breath-taking social naivete, resulting in the firmly held, profoundly socially unaware belief that his friends would "never" share the information to outsiders and additional, naïve beliefs that online "friends" could not possibly be agents of foreign governments. All of these – rigid thinking, obsessionality, and social naivete – occurred in the larger context of, on the one hand, abysmal social failure and social isolation in the workplace and on the other, the intensely positive and relief-bringing feelings of social connection that Jack describes with his online community where he felt, in his words, for the first time in his life, accepted and understood.

Exhibit A at 35.

An autism diagnoses does *not* mean that Jack lacked strengths or intelligence. To the contrary, "Jack has many notable strengths and job skills.  He is intellectually curious and extremely bright." *Id.* "He is verbally intelligent and adept at some types of research.  He likes to learn." *Id.* "Unfortunately, some of these very strengths work against him in the present context because it is difficult for most people to grasp how one could be intelligent and yet fail so

dramatically to see the larger picture."  Exhibit A at 36 (also noting in a footnote, "[I]ndividuals with Asperger syndrome can be denied recognition and help because they are intellectually bright and may be able to give the impression of a near normal competence in routine interactions. The appearance of normality is deceptive, however, and breaks down when novel or stressful situations arise."), *citing*, Uta Frith, *Emanuel Miller lecture: Confusions and controversies about Asperger syndrome*, 45 Journal of Child Psychology and Psychiatry 4, at 683 (available at https://doi.org/10.1111/j.1469-7610.2004.00262.x) (last accessed, October 17, 2024).[5] Conversely, Jack's intelligence and other strengths do not diminish the substantial impact his disabilities had on his decision-making and conduct in this case.

As Dr. Roberts's stressed, "in making judgments about Jack it is critical to understand that his apparent abilities in other areas are not a measure of his actual social competence, flexibility in problem-solving, and capacity for making wise, socially informed choices."  Exhibit A at 36, *citing*, American Psychiatric Association, Diagnostic and Statistical Manuel of Mental Disorders-5 ("DSM-5") (2013), at 55 ("Even those with average or high intelligence have an uneven profile of abilities. The gap between intellectual and adaptive functional skills is often large…."). "Outcome research concerning adults with autism spectrum condition without intellectual

---

[5]     "The 1994 publication of the fourth revision (DSM-IV) was a landmark in the recognition of individuals with autistic conditions without intellectual impairment, as, for the first time, it included the autistic subtype 'Asperger's Disorder,' a name derived from a 1944 description by Austrian psychiatrist Hans Asperger. Asperger's Disorder was characterized by intact intelligence and grossly normal language development but with the characteristic social learning deficits, rigid thinking and behavior, and odd, repetitive behaviors and interests that have historically defined autism. Asperger's Disorder has been observed to be '…associated with particular deficits in social judgment.'" Exhibit A at 2, *citing*, Tatam, D., *Characterizing the Fundamental Social Handicap in Autism*, 55 Acta Paedopsychiatrica 55(2) (1992), at 83-91.  In the DSM-5, first published in 2013, the classification of Asperger's Disorder was "refined such that autistics conditions as a whole were identified as 'autism spectrum disorders.'"  Exhibit A at 3.

impairment such as Jack paint a dramatic picture of the profoundly disabling, handicapping nature

of this condition and its drastic, negative impact on adult adjustment." Exhibit A at 5.

> The point is that autistic individuals with intact or even advanced intelligence [like Jack] are demonstrably disabled. When their behavior is under consideration within the criminal justice system, it should be considered in the context of the outcome evidence indicating the extreme, pervasive nature of their neurodevelopmental disabilities and, for the majority [including Jack], the lack of appropriate supports in their histories.

Exhibit A at 5-6.

### B.   Family History and Early Childhood

Jack Douglas Teixeira, a now 22-year-old young man, is the only child born to Dawn

Dufault and Jack Michael Teixeira. He has an older half-sister with whom he grew up and two

stepsiblings from his mother's second marriage. Both of his parents grew up in Massachusetts,

where Jack has lived his entire life.

Jack was born a couple of years after his parents married. Dawn stayed home with him and



found him an easy baby who met his developmental milestones early, including talking. By the time he was 3 years old, his sister Danielle said, "He would walk around the parking lot at my softball games with his father and name every type of car based on the logo. Because he was a little kid, everyone just thought it was cute," and they did not pick up on the

7

early signs that he might be autistic.  He had books on military specifications for tanks and airplanes throughout history that he would carry everywhere, even past the point of wearing the covers off the books. Dawn said he had the language and ability early on to describe them in detail: "It was an almost encyclopedic knowledge…. He would talk your ear off – to the point that they had to tell him it was enough."



When Danielle was in college, she often babysat him while living in the dorm, and Jack, who was in elementary school could debate her friends in history and they all thought it was cute because he was a little kid.

As Danielle discussed in her letter to this Court:

> My brother has always been there for me when I needed him. He was the first one to be there when I needed help moving out of my apartment after my first big breakup. Lending a shoulder to cry on the whole ride home and then telling me to stop crying because everything will always be okay. He has never forgotten a birthday or holiday and I could always count on him to be there with a big hug and "I love you Sis" whenever I would see him. If he thought I was upset or feeling down he would go out into our mom's garden and pick me flowers to cheer me up. He would make goofy faces and tell jokes to put a smile on my face. I have watched Jack grow from an infant to a man, and despite the events that have led to me writing this letter, I am proud of the respectful, kind, and intelligent man he has become.

Exhibit B at 8.

Before Jack started school, Dawn began as a volunteer for Home for Our Troops.[6]  She became their first employee and was the executive director when she left in 2013. The position required a lot of travel which ultimately caused a strain in her relationship with Jack Sr.  When Jack was in the first grade, his parents separated and then divorced in 2009.

Through kindergarten, Jack attended the Twin Oaks Farm Preschool where Dawn's sister and niece both worked. The preschool's "Readiness Evaluation for 1st grade" (6/5/2008) noted, "At times, Jack has difficulty handling conflict resolution when logic and effective communication skills are needed."

He started 1st grade at Dighton Elementary and "that's when things went haywire," according to Dawn.  Jack recounted having temper tantrums in class. Reportedly, he was throwing himself on the ground and was inconsolable.  His pediatrician, Dr. Arbetta Kambe (10/8/2008), noted that he was "making noises all the time…. Also has a constant cough, no cold [symptoms]. Past 6 months.  ACTIVE MAKING SOUNDS THROUGHOUT VISIT" (caps in original). On a subsequent visit (11/6/2008), she noted that the cough was most likely behavior related, though the records do not explain why she came to that conclusion and failed to recognize that it could be a symptom of something more.[7]  She recommended an evaluation and thought he had Attention Deficit Hyperactivity Disorder ("ADHD"). Dawn said she expressed her concern about Jack's throat clearing tic to Dr. Kambe for almost six months, who just told her that it was allergies. She tore up all the rugs in the house as a result.  Later, he developed a neck tic.

---

[6]     Home for Our Troops "builds and donates specially adapted custom homes nationwide for severely injured post-9/11 Veterans, to enable them to rebuild their lives" (https://www.hfotusa.org/mission/).

[7]     The records suggest that his pediatrician looked at this as a voluntary behavior not an involuntary behavior such as a tic.

By December 2008, just prior to his seventh birthday, Jack verbally threatened a student and hit two students at recess.  His parents brought him to counseling and sought behavioral and educational testing. According to the South East Center Occupational Therapy Evaluation (1/13/2009), "Jack tended to speak louder than necessary at times indicating difficulty modulating and grading his voice." It was also noted that, "Jack is noticing more sensation, therefore receiving irrelevant sensory input and missing out on important cues and information."  Maryann Shaker, who completed the "Classroom Observation Checklist" (1/22/2009) and written observations, indicated that Jack had:

> Difficulty modulating voice – too loud at times; difficulty staying on topic; seems to ignore teacher directions; Jack does not appear to always give eye contact when speaking to others. Also observed rushing through work not taking pride in his work.  He seems to play alone…he parallel plays.[8]  He does not appear to have many friends. Other children seem to stay away or fear him.  He needs a lot of prompts. Made some "clucking sounds as he wrote." Made tapping noises with his fingers. Unlaced his shoes, put his hands in his face, shouting out "yes"' without raising his hand, and making noises with his feet.  Noticed him pinching his cheeks under his eyes, with his fingers and was mumbling.

Dighton Elementary School determined that Jack had ADHD, found he was eligible for special education services (3/17/2009), and placed him on an Individualized Education Plan (IEP). Jack recalled going to a "special help" classroom that he liked, mostly because he could spend time out of class. His mother said that she initially resisted the idea of medication, but medical records indicate that he started Ritalin in the first grade.[9] A psychological evaluation completed

---

[8]     Parallel play is a stage of play development when children play close to each other but don't interact. Notably, "autistic children are more likely to be amenable to parallel play." *See* Rudy, Lisa Jo. "Why Autistic Children Play Differently - Autism." *Verywell Health*, October 12, 2023 (available at https://www.verywellhealth.com/autistic-child-form-of-play-259884) (last accessed, August 1, 2024).

[9]     Ritalin or Methylphenidate is commonly used to treat ADHD.



by Dr. Thomas Beaulac, PsyD, on March 28, 2009, noted that Jack had characteristics of Asperger's Syndrome,[10] though he did not give him a diagnosis at the time. Dr. Beaulac reported that Jack had difficulty interpreting and responding to social cues, tended to isolate socially and engaged in fantasy play. Dawn said he could often be found "playing pretend by himself." His 1st grade classroom teacher, Lisa Perry, noted in an Educational Assessment that Jack "walks around and pretends he is in a video game."

Later that year (5/6/2009), handwritten notes found in his educational records state that he was overheard in the bathroom talking to himself, stating that he wanted to kill his teacher with a BB gun. These notes also state that Jack spoke about his parents getting divorced, which appeared to coincide with this event. Dr. Beaulac completed a safety assessment on May 7, 2009.  He reported that Jack was able to discuss the situation, recognize that what he said was wrong, and did not present any imminent risk of harm to himself or others. Dr. Beaulac then recommended that Jack be allowed to return to school.

By the end of the 2nd grade, despite school records noting many of the same behaviors (verbal outbursts, difficulty modulating his tone, making clicking noises, perseverating), it was recommended that Jack no longer be on an IEP. Instead, the school opted to provide services on a

---

[10]    At the time Asperger's Syndrome was a separate diagnosis in the DSM-IV.  In 2013, the DSM-5 removed Asperger's Syndrome and replaced it with the broader term Autism Spectrum Disorder ("ASD").  Dr. Roberts discusses Dr. Beaulac's assessment, remarking, "In hindsight, the evaluation process highlighted classic features of an autism spectrum condition that required further investigation, but opportunities for specialized, follow-up evaluation, which could have led to accurate diagnosis and appropriate treatment, were again missed." Exhibit A at 11.

504 plan.[11] Elementary school seemed to improve for Jack. He was responsive to teacher intervention. His Section 504 Accommodation Plan (4/1/2012) noted that his 4th grade teacher let him have space to self-regulate and that he needed help with peers "due to his weaker social understanding." Jack continued in individual therapy, though recounted that he didn't like it and that he "felt unsettled and would resist going and would just give one-word answers."

Despite his struggling socially in elementary school, his parents reported that he did well at the Dighton YMCA's afterschool program.  As much as possible, his parents had him engage in traditional activities. In the summers, he attended day camp, beginning when he was six for several years. They tried to get Jack involved in sports, but he refused everything – t-ball, basketball, and soccer.  Dawn recalled that he particularly didn't like basketball as other kids "were in his face and he found it stressful."  Due to Dawn's work commitments, Jack often traveled with her and had the opportunity to meet veterans who had been severely wounded during combat. Dawn said that, as a young child, he could hold his own in conversations with adults but struggled with kids his own age.  Dawn has always called Jack her "special boy, because people just didn't get him."

Jack Sr. picked Jack up after school on Mondays, Wednesdays, and Fridays and he would sleep over every Wednesday and every other weekend. They often spent their time playing video games, which he said Jack could spend hours doing. On the weekends, Jack Sr. tried to plan an activity for them, which was often focused on military-based things such as airshows or going to Battleship Cove in Fall River.

---

[11]     While a 504 plan is still considered a method to provide special education services, the accommodations are less than what a student would receive if they were getting services through an IEP.



*Jack Sr. and Jack at Yosemite*

Once, when Jack was still pretty young his father took him to an airshow at Bradley Airfield in Connecticut.  There was a junkyard of old plane parts and Jack was able to name the planes they were from and the particular models. There was a veteran there who was amazed by Jack's knowledge.  At times, he recounted that he had to "move Jack on, as he would go overboard and get stuck on a topic and it would be hard to stop him."   In the summers, Jack Sr. took Jack on week-long vacations, trying to expose him to new experiences, which Jack acknowledged he enjoyed, even when he "would have preferred to stay at home."

Danielle, who was involved in sports and wanted to do things outdoors, said Jack was the opposite. "He wasn't an 'outside kid.'  I finally convinced him to go fishing with me… I had to bribe him with donuts… I took him to a pond in North Attleboro where I knew it would be easy to catch fish.  He posed for pictures with the fish – but I had to help him hold it, he wouldn't touch it.  When we were done, he told me 'It was really fun, but can we not do it again.'"



*Dawn, Danielle, and Jack*

In elementary school, Jack became friends with Duncan Tarver. According to Duncan, because their last names were close to each other, they were together whenever they were seated as a class alphabetically or put in groups based on last names.  When Jack began taking the bus home after school to his father's house, he became closer with Duncan and another child, Jason, who all got off at the same stop.  The three regularly went to each other's homes after school and

13

Duncan and Jason were the only two kids who ever came over for sleepovers at Jack's house or for Jack's birthday.

### C.    Middle School

Once in middle school, Jack appeared to be progressing. His annual 504 Accommodation meetings had minimal notes regarding how he was doing in class academically or socially. He was still taking Ritalin, though by the 7th grade, Dr. Kambe noted in the record that he wasn't taking it consistently.  He continued to be socially awkward and didn't have many friends.  His parents tried to get him involved in robotics, thinking he would be more interested in something non-athletic, but he wasn't. Dawn said the teachers never called or expressed concerns about Jack, so "we felt grateful and thought everything was good."

While still working for Home for Our Troops, Dawn earned her bachelor's degree in 2010 from Northeastern University, which she completed primarily online. She stopped traveling as much, held a few different jobs, and in 2015 began working for SADD (Students Against Drunk Driving) in a more local position.

In October 2015, when Jack was in the 8th grade, Dawn became romantically involved with Thomas "Tom" Dufault.[12] The start of Dawn's relationship with Tom coincidentally overlapped with what Dawn described as Jack's "increased obsession with the military. The way he spoke wasn't like a kid.  He talked with an intensity about things."  He was still walking around with the books he had carried since he was little about military helicopters, planes, and firearms.

---

[12]      Tom retired from 102nd Intelligence Wing at Otis Air National Guard Base in Cape Cod, Massachusetts, and at the time of Jack's presenting offense was working as a contractor on Base. He has two sons from a prior marriage, one of whom also worked at the 102nd Intelligence Wing at Otis Air National Guard Base, and the other who has been diagnosed with Asperger's Syndrome (Autism), Tourette's, and different mental health issues.

He studied the books and memorized all the details of everything he read. Since Tom collected firearms, was in the military, and knew a lot about military planes, he and Jack bonded quickly. Jack looked forward to talking to Tom, and they could talk for hours.

At the end of middle school, Dr. Kambe noted that while Jack was doing well academically in school, he had been off medication for a year and his parents were not in agreement about whether he should restart it; his father thought he should, and his mother was unsure.

### D.       Adolescence, High School Life, and Increased Social Struggles

When Tom moved in with them in 2016, Jack was 14 years old and had just begun attending Dighton-Rehoboth Regional High School. In March 2017, his mom and Tom got married, and Dawn started a florist business, growing flowers on her property. That same month, Jack saw Dr. Kambe, who commented, "Teacher noted that he had an obsession with guns, tanks, war things, plays violent video games…. Mom's husband is in the military and there are guns in the home." She also noted that Jack had restarted Ritalin and indicated that he had been diagnosed with a tic disorder and ADHD.

In high school, Jack immediately struggled with what was socially appropriate to discuss with his peers and teachers. In an email (4/13/2017) to his mother, his guidance counselor, Jacquelyn Tremblett, stated:

> It has been brought to my attention lately that Jack's language has caused some of his classmates to feel uncomfortable around him. I have spoken to him before about this…. I understand from his 504 that he tends to have uncontrollable thoughts and tendencies…. Lately his language has been under control, but he does seem to mention some violent expressions from time to time. He has great interest in machinery and war weapons, but it is really inappropriate to be discussing during class time.

Jack's difficulty fitting in with peers and understanding what was socially acceptable to say or do became clearer as he entered his sophomore year. Jack said that kids would ask him to

do "stupid stuff," and then laughed at him.  He didn't understand until later that he was the one they were making fun of.   Jack described himself as "not being good at talking or social interaction." According to Jack's friend, Duncan:

> His social skills were lacking.  There were times that people would get him to do things or say things, and he would end up being the butt of the joke and didn't realize it. Jack would do things for the shock factor – because he was trying to get the attention of our classmates. He didn't give a rat's ass what other people thought of him.  He was unapologetically him. He'd tell someone they were an asshole right to their face. He didn't seem to be concerned about fitting in socially.  He was just Jack … other kids would egg Jack on to do things.  They would get him to say racial slurs like the "N word."  It was as if he had a lack of connect with the other kids and didn't understand why they were doing it.  Maybe he was doing it to be a part of the group.

Increasingly, Jack's peer group at school played video games online on a regular basis. While his parents knew this, they didn't fully understand what was going on during gaming sessions.  Jack Sr. worried about Jack's lack of social interaction with peers and wanted Jack to meet more people. At the time, he thought "this type of interaction was better than nothing."  But online, Jack said, "Some people who I thought were my friends would pick on me.  They would keep me out of the game or party line." As his friend Duncan stated, "When we were playing video games, his behavior/energy level was hyper – he would be yelling and shouting.  He couldn't read a room. Everyone would be an 8 and Jack would take it to an 11." Duncan acknowledged that other peers were increasingly "not nice" to Jack: "He would get riled up during the game. They would taunt him.  They would say things such as, 'What is the shape of Italy?  A boot,' and then they would boot him out of the group.  Or 'What do you do to a soccer ball?  Kick it,' and kick him out of the group.  They would put him on mute and say they couldn't hear him, and Jack would start to get agitated."

16

Duncan described Jack "as the type of friend that if you ever needed something, he would give you the shirt off his back.  He was always ride or die for his friends…. He was an information sponge.  He could recite facts about anything." At the same time, that could put some people on edge.  Duncan always thought that was "foolish," and it was kids who had never spoken to him that reacted that way – kids who didn't know him. Duncan believed that girls in particular found him "odd."

In March 2018, during his sophomore year, classmates alleged that Jack, now 16 years old, made comments about Molotov cocktails and guns that happened to coincide with a recent active shooter training at school.  As a result, the school called the Dighton Police Department.  Dr. Gould, principal of the Dighton-Rehoboth Regional School, reported that Jack told him that he talked about guns and Molotov cocktails because he likes to talk about those things.  The report states that Dr. Gould explained to Patrolman Todd E. Kuczewski that Jack had a disability and was receiving services through his 504 plan.  In questioning, Jack said that he was thinking about these items in relation to the video game "Call of Duty."

As his stepfather Tom recounted, at the time he was more upset with the principal and how the situation was handled. He believed that Jack had always been an "intense human being and an odd duck" and was perceived that way in school.  Tom thought, "It's connected to him not understanding social cues.  He never cared about what he said and how others might perceive it. The same was true with how he dressed – he didn't care what other people might say.  He just marched to his own drum."

Jack was suspended from school for one day and was evaluated by Dr. Richard Ober, psychologist, who determined that "Jack poses no danger to himself or others either in school or out," and as such no further suspension or discipline was necessary. Notably, as part of the

evaluation, an Asperger's Syndrome Diagnostic Scale was completed, but not scored.  However, on the Child Behavior Checklist that Dawn and Tom completed at the time, they put down that he has tics. Under "has an obsession" and "has something he repeatedly talks about," they put down that he talks about military, guns, war strategy, and history, doesn't modulate his tone of voice (e.g., "loud"), and "Doesn't observe [social cues] with peers and adults. Dominates conversations, doesn't take breaks, or lets others speak without being interrupted."

Despite this incident, a month later, in April 2018, the school tried to remove all special education accommodations for Jack. In response, his mother sent an email to Ms. Tremblett which was incorporated into the 504 Plan:

> Jack's parents would like to make sure that Jack continues to have the support he has now, especially in the area of writing. They are aware that Jack often needs cues to slow down when writing. Overall, they are pleased with the progress he is making and would like to see him continue to progress. Jack enjoys talking about video games and military/other subjects with his friends or in school. Mom indicates that he can have a tendency to use a loud voice and is not aware of others around him (as he does when he is discussing something he is passionate about), Jack needs social prompting to remind him that it's not the place or time, or that he must lower his voice when talking.  He also is sometimes unaware of certain social norms/attitudes surrounding the discussion of topics studied and needs to be prompted. Mom reports that he is a compliant kid, if an adult asks him to stop talking about the subject and tells him why, he will stop and will probably apologize too but he may at another time, need to be prompted again for the same things.  In terms of organization and distraction, while Jack is getting great grades because he is working really hard to stay focused on schoolwork, mom indicates that there are some days when he is mentally exhausted and may need more time to complete things, extra prompting or some latitude from the teacher or help getting organized would be very helpful. In addition, Jack has some sensory processing difficulties, and is very sensitive to smells, touch, temperature, certain sounds or noisy settings, the way clothing feels, etc. and that may be a consideration if he can't concentrate or seems out of sorts at times.

While Jack finished the school year with an A in US History, and Bs in all his other classes except for Spanish where he got a C+, Dawn said that Jack often put a lot of pressure on himself. If he got a bad grade, he would say things like "my life is ruined; I'll never amount to anything." It was if he went "off the deep end" if he didn't get a good grade.

In the summer of 2018, he began working at Kentucky Fried Chicken and worked there until he finished high school. Jack "hated" high school, but never told his mother. He said, "I could hear kids whispering about me, but I tried to brush it off … kids would make jokes about me." Dawn "knew how kids were and how Jack was and [in retrospect] not surprised" about his experience, but at the yearly 504 meetings, the school would tell her that Jack was doing well. Similarly, Duncan wished he had stood up for



*First day of work at KFC*

Jack more. "Jack was a good friend to me. He is someone I value having in my life. It was socially really tough for Jack. He wasn't a crazy emotionless robot that other people thought he was. He was just a weird kid."

In his junior year, Jack got his driver's license and had a truck to drive to school and work. He wasn't seeing his father regularly and enjoyed his independence. He got an A- in "America in the 21st Century and Contemporary World Affairs," C- in Algebra and Physics, and Bs in his other classes, including World History. By March 2020 during his senior year, the COVID-19 Pandemic had hit, and the remainder of his year was virtual. Jack increasingly spent his time online and, like many kids in his situation, did the minimum to finish out the school year, getting Bs and Cs for final grades. He graduated from Dighton-Rehoboth High School in June 2020.

### E.   Military and Continued Social Struggles

Towards the end of high school, Jack's stepfather, Tom, encouraged him to consider joining the Air Force National Guard, as he had done. Tom thought that information technology ("IT") would be a good career path for him.  Jack said the National Guard "made sense" for him: "I wanted to be close to home, not have to live on base or worry about changing stations."  He enlisted, missing his high school graduation to go to basic training.  Dawn and Jack Sr. supported this decision too.

In June 2020, at 18 years old and amid continued COVID restrictions, Jack went to seven-and-a-half weeks of basic training at Lackland Air Force Base in San Antonio, Texas. According to the "Basic Military Training Student Performance Summary" (8/13/2020), Jack had "Satisfactory performance.  Participates as a follower. Obeys orders and follows team leader."  Another section stated that he is a "leader and motivator among his peers - evidenced by his selection as a tactical deployment leader."



*Return home from basic training*

He was home by mid-August. Ordinarily, he would have immediately followed basic training with job-specific training, but it was not until January 2021 that the Air Force sent Jack to "tech school" at Keesler Air Force Base in Biloxi, Mississippi.  Jack said he lived in a dorm setting but had a single room with two bunk beds.  He described the experience as a "stressful time. It was longer than basic training, dragged on … it was like school." He said he tried to keep his head down and just pass.  According to his Air University - Community College of the Air Force transcript, Jack passed all the classes he took during basic training and in tech school.  Because of

COVID, they couldn't leave the base, and Jack once again struggled socially.  He didn't connect

with peers; commenting that many of them were drinking and partying, which he avoided.  Instead,

he spent any free time he had – including late into the night – with his online friends, playing

games and talking to them.  As Dawn wrote in her letter to this Court:

> Jack enlisted in the Massachusetts National Guard at age 17, in his
> junior year of high school. He missed his high school graduation in
> 2020 because he was in Basic Training in Texas. On his 21st
> birthday, of all the things he could have chosen to do, Jack decided
> not to go to a bar, have an alcoholic drink, or go out "partying" as
> many young people do, he chose to go to a dinner movie theater with
> his stepdad and me. Jack has never been interested in engaging in
> alcohol, drugs, or other forms of "partying". His life revolved
> around work or gaming/online group discussions focused primarily
> on current and historical events and other interests.

Letter from Dawn Dufault, Exhibit B at 2.

After returning from military tech school in June 2021, he joined the 102nd Intelligence

Wing of the Massachusetts Air National Guard and immediately began working at Otis Air Force

Base on Cape Cod.  He was commuting around two hours a day and working 12-hour shifts. He

often worked night shifts.  Dawn said his constantly changing schedule "discombobulated" Jack,

and she thought he found them "disorientating." He was increasingly spending time in his room

and online with friends when he was home and was often on an opposite work-sleep schedule from

Dawn and Tom. They had dinner with him maybe once a week at that point. Dawn said she was

trying to let him be independent, but "he was struggling to get things done," such as making doctor

appointments or paying his car insurance.

Jack found just driving to the Cape was an adjustment, in addition to being on base and

working: "I didn't know my way around the local towns on the Cape.  Everything felt new."

Again, Jack found himself in a situation where he struggled socially.  He never "clicked" with

anyone. "It was like being back in high school – lots of bullying and feeling like people were

talking behind my back.  I felt like I was the butt of jokes that I didn't understand."  Jack said he joined the military to get away from bullying and because he thought he would meet like-minded people.  Instead, "people with higher ranks would have weird conversations with me or give me weird looks.  I knew they were talking about me."

As his stepfather, Tom, wrote in his heartfelt letter to this Court:

> [Jack] conveyed to his mother and me when we saw him for the first time after the events of April 13, 2023, that he had experienced extensive bullying and harassment at his job at the 102d Intelligence Wing and throughout his school years. Of this, his mother and I were never made aware by his school or Jack at the time that this was taking place when he was a minor child. As far as being bullied at work and it not being addressed, I would say it relates to the findings of the USAF IG Report that addressed a lack of adequate supervision as a contributing factor in all of this.
>
> While I know Jack has taken responsibility for his actions and is extremely sorry for what he did, as a career Airman, I can't fully express the disappointment I feel that his first experience in the Military was adverse and detrimental to his future, when it should have been one of positive mentorship and strong guidance that could have mitigated this situation on the first instance of Jack being admonished, and not being allowed to continue to further admonishments that have led to the case at hand.

Exhibit B at 11.  Jack Sr. similarly noted:

> When Jack was assigned to the 102d Intelligence Wing I was once again hopeful that he would finally be trained in the IT field and take another step forward in his career and his life. Little did I know that this would not be the case. I was unaware of his treatment at the base and his return to a life of bullying and isolation. I believe this pushed him further into his online environment where he felt at home with "friends".

Exhibit B at 6; *see also* Letter from Dawn Dufault, Exhibit B at 3 ("We expected that when Jack joined the military, he would truly find 'his people' and benefit from the structure, discipline, and order that the military would bring, but that didn't happen. The bullying and harassment continued by his peers at the base on Cape Cod where he was starting out his career. Little did we know, at

a time when he should have been mentored and monitored closely by his superiors, Jack was being thrown into a highly toxic work atmosphere, where military structure and discipline didn't exist, where policy and rules were not made a priority, and not one person stepped up to take a leadership or mentorship position to improve conditions there.").

Jack said he tried to make jokes and have "normal" conversations with his co-workers. When "I showed people who I am and what I was interested in [i.e., firearms, cars, video games – what he played, how he played, moments he had on them], they wouldn't get it. They would try to get out of the conversation, push me away, try to avoid me." "I didn't know when to stop a conversation. Sometimes I would keep going because it felt awkward, and I didn't know how to stop. I was not sure what to do. I am never sure whether to stop talking or keep going. I don't understand conversation dynamics very well." Instead, he would do things to get out of conversations. "It made me feel like a freak. I had no friends, no one close with me, like in high school. It was torture."

Jack received letters of counseling,[13] but was afraid to tell his parents. He was concerned particularly about Tom finding out that he wasn't doing well. At the same time, he increasingly turned to his online friends and community. Jack began staying up late and was no longer eating meals with his mom and Tom. Jack began staying up late and was no longer eating meals with his mom and Tom. In retrospect, Jack acknowledged that he was "struggling" but he didn't know

---

[13]   "A Letter of Counseling is merely the recording of an infraction. It's a formal way of describing an unacceptable behavior so that the receiver cannot fail to understand it. Often, Airmen don't realize or understand the seriousness of their behavior. A formal letter of counseling is a way to get their attention and let them know their behavior is not acceptable and explain the possible consequences." "Air Force Letter of Counseling (LOC) Examples." *Air Force Writer* (available at https://www.airforcewriter.com/loc.htm) (last accessed, October 17, 2024).

how to tell his family how he was feeling or what he was experiencing, and he began to feel the weight of their pride in how well they thought he was doing.



*Jack's enlistment photo hangs prominently on his father's wall.*



*Jack Sr.'s truck*

As a result, Jack internalized the pressure he was experiencing at work and the perceived expectations that he believed his mom and Tom had for him. According to Jack, he never let anyone know how difficult a time he was having at work, but his feelings of isolation led him to become increasingly disillusioned by how he was being treated.

The one place that he felt solace was with his online friends "who were the only ones who could understand my problems." He used to come home right after work and immediately go to his room and talk to his online friends. It was a way "to recharge my battery…. I could offload my problems with them…. I would start a conversation with them and I would feel better. They'd invite me to join a game or say they had been waiting for me." Having finally found, in his mind, his first real friend group, when his online friends went through their own difficulties he tried his best to be there for them. As one of these friends, Noah Salinas (also known by his screen name, "Lucca"), explained:

In one specific instance I remember very clearly, during early-2021, as my Mother was recovering from her brain tumor and stroke, I had a strained relationship with both my Father and Brother, and I was being severely bullied in school, I felt like I was at the end of my wits. I was ready to give up, and one night I was having a break down, when I called Jack and explained my situation. Jack stayed up for hours calming me down, listening to me, giving me ways to help myself in this situation, and throughout all of that, he never once regretted being there for me. Before all the improvements Jack had helped me achieve in my life, I was on multiple medications and severely depressed. It was not until I had such a great friend such as him, an outlet for me to talk to, and to receive life improving advice from, that I truly started to work on myself and work on my future.

I truly value Jack's friendship that we've cultivated over the years, I could not have asked for a better friend, no matter the distance between us. He has always been there for me when I needed him, and I hope to always be a friend to him, even in hardship.

Exhibit B at 12.

### F.    Firearms

Contrary to what some might consider the stereotype of Massachusetts, Jack grew up in a community where firearms as a hobby was common. According to Danielle, "Jack knew a lot about guns and was definitely interested in them. The same was true about airplanes. If he liked something, he knew all the facts about them. We all grew up with guns. My father had guns; Big Jack had guns. Lots of people we know hunt. Guns are normal where we live.... In Dighton, it's common to see a target set up for practice in someone's front yard. We have a lot of family in Maine, and everyone had guns there too. It's just how we grew up."

When Tom, who collects guns and military memorabilia, joined the family, he quickly learned that one way to connect with Jack was around his interest in guns. He said that Jack learned to target shoot by playing video games. "One time we went to Maine to visit my parents and I took Jack to skeet shoot with me and my dad. It was his first time and Jack was able to hit the targets without any issue. My father was amazed." Tom said he taught Jack firearm discipline: how to

handle a gun around other people.  Jack Sr. who was resistant initially to letting Jack use a firearm, used to take him to gun shows and, in more recent years, they spent time together and connected by going to the shooting range.

In the spring of 2018, undoubtedly as a result of having been suspended from school in his sophomore year, the Dighton police rejected Jack's application for a Firearm Identification Card. He applied again in 2019 and 2020 but was denied again even after turning eighteen.  However, in November 2020, after he returned from basic training, he applied a fourth time.  With the assistance of Tom, who acknowledged he helped Jack draft most of the application narrative, Jack wrote a statement about what happened in school and how he had changed and was now enlisted in the military. In July 2021, he was granted a Firearm Identification Card and, in February 2023, received a LTC (license to carry firearms).  Notably, as he had been taught by Tom, once Jack was finally licensed to possess and carry firearms, he stored his guns safely in a locked cabinet in his bedroom.  In fact, during the search of Jack's room by the FBI, agents needed to drill into his locked gun safe in order to access his firearms.

Tom adds:

> Jack's interest in firearms dovetails with his deep interest in all militaria. This interest lends more towards the personality of a history buff who has extreme knowledge about firearms or Military equipment, for example, how and where the item of interest was manufactured, the metallurgy of the item, how long it was in service, how it was utilized, how to take it apart and put it back together again. The breadth of his interest was not limited to firearms; it was tanks, aircraft, ships, vehicles, the pieces, parts, and capabilities of each. The level of detail he had in his head was astounding, and he would talk about it at great length to anyone who would listen, which naturally put some people off or made them uncomfortable.

Exhibit B at 10; *see also* Letter from Dawn Dufault, Exhibit B at 1 ("Throughout his life, Jack demonstrated immense curiosity and an insatiable thirst for knowledge…. It was not uncommon

to see him carry several encyclopedias in his backpack at once, which he intently perused and studied daily, at school, on vacation, and during downtime at home for several years. If Jack wasn't studying these books, he would be talking incessantly about the content to anyone who would listen.").[14]

### G.   COVID, Social Isolation, and Finding an Online Community

Since middle school, Jack has regularly played video games online. Initially, the kids he played with were balanced between school and real-life peers. But, as previously discussed, in

---

[14]    Jack's "thirst for knowledge" went well beyond the guns or the military.  Jack's mother discusses his love of cars, *see* Exhibit B at 1, and his father retells this anecdote:

> Another story that stands out to me was when Jack was thirteen years old. We went on a whale watch, it was cold and windy so we went inside the cabin of the boat to get warm on the way back to the docks. While we were sitting down two young girls were standing next to our booth as all the seats were taken. Jack stood up, offered the girls his seat and sat beside me. The girls thanked him and Jack instantly detected their accents. He asked them if they were from Germany. Both girls, blonde with blue eyes and strong accents said they were German students in the United States on vacation. Jack asked them where they were from and they told him their small town they lived in. Jack instantly said, "I know where that is". He then proceeded to tell the girls all he knew about their town, its location from Berlin and the historical significance of the town. The girls were amazed that he knew about their town and his knowledge of it. They asked how old he was and still could not believe someone so young could know about their town. For the next hour they talked about Germany, what the girls did, the food they ate and games they played. He asked many other questions regarding their culture and shared his knowledge of their country, too many questions actually. When we docked the girls followed us off the boat, Jack shook their hands and thanked them.

Exhibit B at 5.  While these stories provide a glimpse of Jack's kindheartedness, they also highlight clear early indications of autism.  *See* Report of Dr. Roberts, Exhibit A at 33 (discussing how obsessionality is "common in autism"; "Jack's obsessionality was also manifest at all contacts in his frequent and exhaustive provision of excessive detail and 'listing'—that is, offering a statement and then listing an exhaustive and unnecessary list of exemplars for his statement.").

high school Jack's group of friends regularly excluded and mocked him. At some point, he started to leave those real-life peers behind and discovered an online world where he found belonging and acceptance.

Then came the pandemic.  The American Psychological Association has concluded that as a result of the pandemic, "**We are facing a national mental health crisis that could yield serious health and social consequences for years to come.**" *Stress in America ™ 2020: A National Mental Health Crisis*, APA, October 2020 (available to https://www.apa.org/news/press/stress/2020/sia-mental-health-crisis.pdf) (last accessed, October 18, 2024) (emphasis in original).  "While older Americans [were often] able to embrace the feeling of 'this, too, shall pass,' Gen Z adults (ages 18-23) [were] at a pivotal moment in their lives, and [were] experiencing adulthood at a time when the future look[ed] uncertain." *Id.*  As a result, "Gen Z adults report the highest stress level during the prior month, on average, at 6.1 out of 10. This is significantly higher than all other generations." *Id.*

Others reached similar conclusions, noting, "Since the pandemic began, rates of psychological distress among young people, including symptoms of anxiety, depression, and other mental health disorders, have increased." *Protecting Youth Mental Health: The U.S. Surgeon General's Advisory* (2021), at 9 (available at https://www.hhs.gov/sites/Default/files/surgeon-general-youth-mental-health-advisory.pdf) (last accessed, October 18, 2024).  "Recent research covering 80,000 youth globally found that depressive and anxiety symptoms doubled during the pandemic, with 25% of youth experiencing depressive symptoms and 20% experiencing anxiety symptoms." *Id., citing*, Racine, N., McArthur, B. A., Cooke, J. E., Eirich, R., Zhu, J., & Madigan, S., *Global Prevalence of Depressive and Anxiety Symptoms in Children and Adolescents During COVID-19: A Meta-analysis*, JAMA Pediatrics (2021), at 175(11). "[Y]oung people also

experienced other challenges that may have affected their mental and emotional wellbeing," not the least of which has been "an increasingly polarized political dialogue … and emotionally-charged misinformation." *Id., citing, inter alia*, Johnston, W. M., & Davey, G. C., *The psychological impact of negative TV news bulletins: the catastrophizing of personal worries*, British Journal of Psychology, Vol. 88, Issue 1 (2011), at 88.

Not surprisingly, in light of the isolation imposed by COVID-era closures and social distancing, "[t]he COVID-19 pandemic … rapidly acerated [a] trend" of spending "more and more of our [and their] lives … on[] social media platforms and other digital public spaces." *Protecting Youth Mental Health: The U.S. Surgeon General's Advisory* (2021), <u>supra</u>, at 25. ***"In 2020, 81% of 14- to 22-year-olds said they used social media," like, for example, Discord, either 'daily' or 'almost constantly.'"*** *Id.* (emphasis added), *citing*, Rideout, V., Fox, S., Peebles, A., & Robb, M. B., *Coping with COVID-19: How Young People Use Digital Media To Manage Their Mental Health (2021)*, Common Sense and Hopelab (2021) (available at <u>https://www.commonsensemedia.org/sites/Default/files/research/report/2021-coping-with-covid19-full-report.pdf</u>) (last accessed, October 18, 2024).

For Jack, the sudden imposition of COVID-19 pandemic restrictions meant that he was able to stay in his room for hours on end and didn't need to leave his family's property. Dawn said he got a gaming computer/tower during his senior year of high school and would play all night and sleep all day, often shouting and with no awareness that Dawn and Tom might be trying to sleep. Dawn half-joked that Jack would only come out of his room "for a feeding." According to Tom, Jack had minimal interaction with people before COVID, but then that went away completely. Dawn said that the pandemic lockdown resulted in much of this behavior getting worse as he increased the time he was online, specifically on the Discord social medial platform.

Discord, Jack's social media world of choice, "is a free communication app used by tens of millions of people to talk and hang out with their favorite creators, communities and friends…. While people may discover [their] content all across the reaches of the internet, Discord is the 'home base' where [they can] come together and connect." *Discord 101: What is Discord?* (available at <https://discord.com/creators/what-is-discord>) (last accessed, October 17, 2024). Notably, Discord contains both public and private forums, called "servers," where users meet to discuss their shared interests.  The overwhelming majority of Jack's unlawful conduct occurred on private servers (i.e., servers that required approval from the moderator to gain entry), or via direct messages.

Nonetheless, Jack's Discord community became his refuge – a home where he could discuss his interests in military gear, weapons, cards, video games, and 1980s action movies with people that shared the same obsessions.  When he was at basic training and later tech school, the people he met on Discord were the group of people who he soon described as his closest friends, people he could consistently count on being there, even if "there" was an online world.

Once he started working on the Air Force base, his true friends, in his mind, were waiting for him online when he got home. As he stated, "When I was working, they were always in the back of my mind…. I would text them during shifts, but on the days that I wasn't working, I would be online the entire time." He said that, except for the minimal expectations that his mother set for him like taking out the trash, he was in his room.

Crow met Jack online sometime towards the end of 2020 after she was invited to join the same Discord server that he was on.  She described herself as also interested in military history and playing video games online from a young age.  They started to connect outside of the group and, at some point, considered themselves to be dating, though they never met in person.  She said

that they talked about things like "dragons and dinosaurs.  Things that reminded him of his childhood.  He felt like it wasn't masculine to talk about liking those things," but would talk to her about them. The times she saw him upset was if he was "losing in a video game.  He was never angry about something substantive. He didn't take sarcasm well…. He absolutely couldn't read social cues … lots of people on the server were autistic or seemed that way."

While Jack had tech school and later work, Crow described a similar routine that many of their other online friends had during this time-period.  She would wake up around 7:00 a.m., logon to Discord, and was often on until 3:00 a.m. everyday.  While she was supposed to be doing online school, those expectations were minimal so she could easily spend all day on the server.

According to Crow, Jack "wanted to give advice to younger people on the server.  He would talk about living life in the right way.  He wanted to impart knowledge or information to them."  They all talked about guns – the ones they played with online in games and the ones that they had in real life.  She said Jack got upset with her about the gun she used to play games with because he thought it wasn't a good gun, which she thought was funny since it was just a game.  Crow liked it because of how it looked, while Jack would focus on the mechanical problems that made it not a good firearm.   Jack considered Crow his girlfriend even though their dates were all online, but they broke up sometime in 2021 after which she left the server.  She couldn't recall the exact date.

Lucca, another friend from the same Discord server, stated:

> It was COVID…. It was great to have online friends who could do dumb kid things with and have fun.  We would be on the server, pop onto the voice channel.  We would play games, talk about news, what was up with our morning.  It wasn't much different than a group chat on the phone.  But there was a deeper connection, it was more like a face to face.  We would sit and talk about all sorts of things often till 2-3 am…. We would send images to each other to show what we were talking about.  So even if you weren't on the

call, you could often deduce what was going on.  We had a channel
for pets, to show what we were cooking, about cars, etc.

Jack and his online friends described the other members as a close-knit racially diverse friend-group. Innawoods and Lucca said they could see how, not knowing the actual dynamics of the group, things could be easily misperceived, particularly the many inappropriate/inflammatory jokes that were made. But Lucca said, "At the end of the day we were all friends. Some was kids making jokes for shock factor.  Who could outdo the next one.  We joked about Nazis. I'm Hispanic.  Why would I advocate for my extinction?  It makes no sense. People didn't understand the irony.  We were a bunch of teens unsupervised seeing how and what we could get away with saying…. Lots of one upping each other.  Who could say the most offensive things for the biggest laughs.  Mostly it was jokes, no matter how bad." They also had movie nights where they would all watch a movie at the same time and comment about it on Discord, and they would talk politics too; mostly they were just teenagers and young adults bonding online during a time when no one could comfortably hang out together in-person. [15]

Lucca, who described Jack as an "older brother or cool uncle," said Jack "helped out a lot of people who were in really dark places because of COVID."  Lucca was depressed, at times suicidal. "He'd sit with me for hours and talk me through it [times he felt hopeless/like giving up]…. He was unbelievably patient with me. He did everything to help me get better." Jack gave him advice, encouraging him to "be more physically active, to go to church, to eat better" among other things. Lucca said he was able to stop taking medication at the approval of his doctor and attributed Jack's support as the reason.

---

[15]    Both Crow and Lucca, for example, have immunocompromised parents, which further limited their social contact outside of their homes during the pandemic.

In late 2021, Jack started to break out of the online world slowly by becoming friends "in real life" with Innawoods, who was also part of the same server and lived close by.  He would visit Innawoods at his house, attended family gatherings there, and they would go to the shooting range together with either his father or Innawoods's father or both.  Jack described this in-person friendship as the exception, not the norm.

In thinking about the way that the COVID-19 pandemic and "an increasingly digitalised world has affected the way in which people socialise with others" (British English spelling in original), Dr. Jonathan Kuek[16] stated:

> People tend to live their entire lives online. And when they do, they also tend to have a difficulty disconnecting from this online world, especially if they have found a genuine community. This is not a bad thing per se, but sometimes, the consequence of this ... is feeling socially isolated when you talk about the real world.

Rajendran, Nadarajan, and Nikki Yeo. *Whether online or in the physical world, community is the key to youth wellness: IPS forum*, Today Online, January 23, 2024 (available at https://www.todayonline.com/singapore/youth-internet-isolation-mental-health-online-communities-ips-2347286) (last accessed, October 17, 2024).

For Jack and his online friends who were interviewed, it was clear that there were multiple factors and commonalities between them that made this online interaction so strong.  They all reported difficulties in social relationships, feeling like they didn't fit in in their schools and communities. Many, like Jack, were from non-traditional family structures (e.g., divorced parents), and others faced the burdens of caring for parents with debilitating health issues.  During the pandemic, they suddenly found themselves in an invitation-only community where they belonged,

---

[16]     Dr Jonathan Kuek is a mental health researcher and co-founder of Total Wellness InitiativeSG, a prevention-oriented health and wellness social enterprise in Singapore.

where the jokes they made and the things they were at times hyper-focused on did not make them outcasts.  The pandemic increased the intensity of these online experiences as they were suddenly able to spend an excessive number of hours of the day together.

### H.    Autism Spectrum Disorder

As discussed further in the expert report of Dr. Elizabeth Roberts (Exhibit A), in first grade, Jack was diagnosed with ADHD. Early on, his pediatrician, his academic record, and at times psychologists who evaluated him noted that he exhibited characteristics and symptomatology associated with someone with Autism Spectrum Disorder (ASD), though he was never formally diagnosed as such. While it is possible for ADHD and ASD to co-occur and share some overlapping symptoms, it is also possible that what is first seen as ADHD is actually ASD.

"Often, children with ADHD have difficulty focusing on one activity or task.  When they are engaged in their daily activities they may be easily distracted.  It is challenging for children with ADHD to complete one task before jumping to another, and they are often physically unable to sit still." *ADHD and Autism Spectrum Disorder*, CHADD (available at https://chadd.org/about-adhd/adhd-and-autism-spectrum-disorder/) (last accessed, October 18, 2024). ADHD primarily affects attention, impulsivity, and hyperactivity, while autism primarily affects social communication and interaction, along with restricted interests and repetitive behaviors.  "In fact, ADHD is the most common coexisting condition in children with ASD." *Id.*

"Children with ASD are most likely to be overfocused, unable to shift their attention to the next task.  They are often inflexible when it comes to their routines, with low tolerance for change…. Their intense focus means people with ASD are often able to remember detailed facts for a long time…" *Id.* Dawn recalled filling out the Aspergers Symptomatology questionnaire in the office waiting room of Dr. Ober and that Jack seemed to meet the criteria.  She said her "heart

wasn't into it" when asked why she didn't pursue a diagnosis.  He was doing well in school, and she "just thought that he was smart, but quirky."

There were always small signs that he was in fact autistic. For example, it is common for people who are autistic to experience hypersensitivity (over-responsiveness) to certain stimuli. "Certain sounds, smells, textures and taste can also be overwhelming." *Sensory Issues,* Autism Speaks (available at https://www.autismspeaks.org/sensory-issues) (last accessed, October 21, 2024). Dawn said Jack didn't like wearing jeans when he was younger because they were "rough." He didn't want tags in his clothes. In middle school, she was able to find him cargo pants that were "soft."  His sensory issues extended to food.  He didn't like soda, which she said he described as "spicy."  He would wait till his food was completely cold before eating it.

When he was younger, he'd sit at the counter for dinner and could talk about helicopters for hours.  When Dawn was ready to move on, she had to "redirect his brain," but sometimes she still couldn't get him to shift topics. She was amazed at all the information he could retain. At family gatherings, people could be shifting in their seats, looking elsewhere, and he just didn't get it.  "Family accepts you. They accommodate you," but that's not true in public. His difficulty understanding non-verbal cues meant that even with family, he didn't know when a conversation was over.  "If it was in his brain, it came out of his mouth."

Danielle said that while they didn't ever talk about it, her mother's nephew is autistic, and Jack was similar in "how awkward he is." It was more "noticeable," however, with their cousin, who exhibited more stereotypical behaviors, such as an inability to make eye contact when someone said hello.  However, unlike other kids in middle and high school, Jack was unaware of the social implications of how he dressed and what others might think: for example, wearing pants that were way too short unless Dawn stopped him.

Unprompted, Aaron Tarver, Duncan's father, said "Jack has always struck me as someone autistic.  We have a nephew who is autistic and Jack is very similar.  Jack was always interested in statistics and talking about military planes."  Aaron served nine years in the Air Force and was often home when Jack came over.  "Jack was very black and white in how he thought. If he thought something wasn't right, he would just say it.  There is a certain part of Jack that just can't lie.  If he thought someone wasn't telling the truth, it would chap his ass…. The only time he got upset was if something went wrong in the [video]game."

When Tom met Jack, he assumed Dawn knew Jack was autistic, because she always referred to Jack as "my special child." For Tom, who has an older son with autism, it seemed clear. Jack would hyperfocus on certain things. It didn't matter what else was going on, as soon as Tom walked in from work, Jack would immediately start peppering him with questions: "What do you think of this or that."  He needed answers right away.  Tom would "cue Jack to social cues." He would remind Jack to acknowledge Mother's Day and Dawn's birthday or get him to ask Dawn if she wanted coffee when he was going to Dunkin' Donuts. If asked, Tom thought Jack would say he was doing it because "Tom said I should do this, so I'm doing this."

Jack found his parents over-protective. He described situations where his father corrected him on basic social skills out in public, e.g., to say excuse me when he brushed against someone. He said he didn't understand this and would get upset. The same was true with his mother: he often felt he was in a "no-win" situation as he was unable to figure out what the correct tone of voice or facial expression was for different social situations. He experienced this as them giving him directions that he didn't need.  "They always have a lot of rules they expect me to follow."

Figuring out social cues combined with having sensory issues can be overwhelming:

> Having unique sensitivities to certain types of sensory input can create challenges in everyday situations like school, work or

> community settings. For someone who is **hypersensitive**, it can take a lot of effort to spend all day under LED or fluorescent lights, navigate a crowded space or process conversations in rooms with background noise. This can be incredibly physically and emotionally draining and can leave the person feeling too exhausted to do other important tasks.

*Sensory Issues*, Autism Speaks (available at https://www.autismspeaks.org/sensory-issues).

Jack acknowledged that he struggles to understand and read social cues. Because of the special unit he is on at Plymouth County Correctional Facility, this has not caused him major problems, but it could in a different correctional institution.[17] He goes through his day "worrying and obsessing" about what other people are thinking because of things he has said or done.  Feeling awkward during a conversation is common for him, and he often worries if he should have stopped talking sooner and not said something, or if he did something that someone else may have taken the wrong way.  He spends time wondering "what is wrong with me," and he struggles to "change who I am, but I can't." At Plymouth, "I have left and come back and checked in with guys to make sure they aren't upset with me just ending a conversation and walking away.  It all feels unnatural. I hate it.  I don't know what to do and worry about what I should have done instead."

It was for these reasons that Lucca said that the online community he had with Jack was a refuge. Since they both experienced the world in a similar manner: "It was a way more comfortable way for me to interact with peers. I could be online in my own room.  People couldn't study me;

---

[17]    Jack was initially housed in Plymouth County Correctional Facility's G-Unit, which is the segregation unit due to his high-profile charges. Detainees are locked in their cells 23 hours per day, in cells where the lights remain on at all times. Jack was housed in his own cell on the unit. On July 4, 2023, he moved to the BN2 Unit, which is a protective custody unit for unsentenced detainees. Detainees are placed there for a variety of reasons including due to being at risk for the nature of their charges, cooperation, or other need for removal from general population. It is an open-dormitory of 42 beds.  At the present time, counsel are unaware of the classification level that the BOP will assign to Jack after he is sentenced, nor which facility, or unit within that facility, he will be designated to.

you don't feel judged for mannerisms or tone. You don't have to worry about getting away from contact with others. In person, people would give me weird looks. I often felt like I was being judged, or looked at, funny. Online, I felt like I had a voice and was respected, just like everyone else had a voice and were respected."

Prior to his arrest, Jack never lived independently, and the most time he spent away from home was when he went to tech school where he struggled socially and was unable to make connections with others. Despite his having reached the age that marks adulthood, it was hard for his parents to see him this way. They expressed constant concern about him and how he functioned in the world and his inability to master many basic life skills. For example, when asked recently about going grocery shopping, Jack replied that he didn't think he could do it on his own. He worried that he would get stuck if he was faced with so many choices.



*Dawn, Jack, and Cherokee*

It is important to recognize that, while Jack at times presents as blunt or hyper-focused on a particular topic, he is also at times overwhelmed by his emotions. Lucca, who only knew Jack online, talked at length about the ways that Jack helped and supported him. Michelle Tarver, Duncan's mother, stated, "It took a lot for Jack's emotions to come out, at times it seemed that things didn't impact him. But he was very compassionate," as she described a time he was quick to come help her when he heard she had lost something. Duncan stated, "Jack wasn't an emotionless war freak as people describe. He loved his dogs and cat… Cherokee [one of his dogs] used to follow us around when we rode our dirt bikes… He was a teddy bear in some ways."

Danielle confirmed this when she said, "Jack always gave the best hugs…. He is a loving kid…. He would try to cheer me up if I needed it."

As previously discussed, Dr. Roberts's concluded that Jack's autism had an impact in the poor decision-making that led to who present offenses.  "Jack was notably cognitively rigid and inflexible in that he was evidently unable to consider other courses of action such as asking for help or any other. Jack acknowledges that in what to others would be a deep irony, he consistently engaged in deceptive behavior toward his co-workers and superiors in rigid adherence to his belief that it was necessary to tell the truth as he saw it to his online community." Exhibit A at 33. Furthermore, "Obsessionality, obsessions, and compulsions are common in autism spectrum conditions." *Id.* (footnote omitted).

> Jack's description of his absorption in the task of getting accurate information to his online friends had a notably obsessional quality. He described that "when the war started, the wealth of knowledge, the nagging feeling that it would be a waste if I just left this." He said, "Every minute I am not looking at something is me missing the truth, things I can see that no one can see. Raw. Almost sacrosanct. Every minute I am not trying to find out what happened is wasted. [] Jack described forfeiting sleep, leisure, his beloved videogaming, and other daily activities in his intense drive to collect and transmit the information. Jack's obsessionality was also manifest at all contacts in his frequent and exhaustive provision of excessive detail and "listing"—that is, offering a statement and then listing an exhaustive and unnecessary list of exemplars for his statement. In the debriefing interview, this is abundantly evident—Jack engaged in perseverative, over-inclusive "listing" across the interview, at minutes 33, 43, 53, 57, and many others.

Exhibit A at 33 (discussing instances where Jack's obsessionality was most prevalent during his recorded Debrief).

In Dr. Roberts's view, Jack also "demonstrated profound social naivete concerning the capacity of the friend group, which included many younger members including a 14-year-old, to refrain from sharing information to outsiders. In failing to consider that members of the online

group could be guided by their own beliefs and intentions, which differed from Jack's own deep

sense of trust in the group, he demonstrated a notable deficit in Theory of Mind." *Id.* at 34.[18]

> This naivete was evident in at least two instances during the debriefing interview. Jack revealed his profound social naivete when describing his assumption that his friend group would not leak the information. That is in minute 68 of the debriefing interview, he answered, "My friends can keep a secret. I had a track record of trusting them." Dramatic social naivete surfaced again in minute 123 when the interviewers asked him, "Did it ever occur to you that there might be people from foreign governments?" He replied, "I mean, I thought it was plausible but at the same time, I didn't see it…. I thought, that with how the people acted online, I didn't really think that they were."

Exhibit A at 34.

Those suffering from autism spectrum disorder often have "extreme difficulty making

friends.  This was true for Jack as well." *Id.*

> His well-documented excessive talking, monologuing on and absorption in preferred topics, lack of sustained social curiosity or interest in others, limitations in Theory of Mind, and the self-directed quality of his everyday choices and activities were significant obstacles across development to forming friendships.
>
> In describing the choices he made, Jack emphasized how thrilled he was to have finally found a group of people who seemed to accept him and admire him and whom he trusted. He described that this was the first time in his life this had happened. He spent hours talking with these newfound "friends" and emphasized, "I LOVED it" and "I finally found a clique I clicked with." He said, "I finally found people who understood the way I thought … I finally found people who were like me. They did not expect me to conform…. They saw me for who I was and accepted that." ***His online experiences were thrilling and novel, coming as they did after a lifetime of social rejection and isolation. In conjunction with his***

---

[18]     "Social naivete is well-documented in autism spectrum conditions and stems from limitation in Theory of Mind. Theory of Mind (ToM) is not a "theory," but rather a term that refers to the ability to consider or imagine other people's thoughts, beliefs, desires, or intentions50 as separate from one's own. Deficits in Theory of Mind are also referred to as "mindblindness." 51 In "mindblindness", autistic individuals fail to perceive the intentions or motives of others." Exhibit A at 34 (citations omitted).

> *rigid, black-and-white thinking, obsessionality, and social naivete,*
> *they are additional context for understanding the decisions and*
> *choices Jack made.*

Exhibit A at 34 (emphasis added).

## I.    <u>Emerging Adulthood</u>

As of this writing we have not received the final draft of the defendant's Pre-Sentence Report ("PSR"), however the initial disclosure of the defendant's PSR, dated, October 8, 2024, at ¶ 102, notes that "[t]he Probation Officer has identified the following as a potential ground[] for departure: U.S.S.G. § 5H1.1 Age." On November 1, 2024, well after Jack pleaded guilty in this case, the Sentencing Guidelines were amended to expand the application of U.S.S.G. § 5H1.1 to "specifically provid[e] that a downward departure may be warranted in cases in which the defendant was youthful at the time of the instant offense…" Amendments to the Sentencing Guidelines, dated, April 30, 2024 (effective, November 1, 2024) (available at https://www.ussc.gov/sites/Default/files/pdf/amendment-process/reader-friendly-amendments/202405_RF.pdf) (last accessed, October 18, 2024), at 25.  As the commentary explaining the reason for the amendment lays out:

> In line with the Commission's statutory duty to establish sentencing policies that reflect "advancement in knowledge of human behavior as it relates to the criminal justice process," 28 U.S.C. § 991(b)(1)(C), this amendment reflects the evolving science and data surrounding youthful individuals, including recognition of the age-crime curve and that cognitive changes lasting into the mid-20s affect individual behavior and culpability. The amendment also reflects expert testimony to the Commission indicating that certain risk factors may contribute to youthful involvement in criminal justice systems, while protective factors, including appropriate interventions, may promote desistance from crime.

*Id.*; *see also United States Sentencing Commission, Youthful Offenders in the Federal System*, at 6-7    (2017)    (available    at    https://www.ussc.gov/sites/Default/files/pdf/research-and-

publications/research-publications/2017/20170525_youthful-offenders.pdf) (last accessed, October 17, 2024); Daniel Romer at al., *Beyond Stereotypes of Adolescent Risk Taking: Placing the Adolescent Brain in Developmental Context,* 27 Developmental Cognitive Neuroscience 19 (2017) (available at https://doi.org/10.1016/j.dcn.2017.07.007) (last accessed, October 17, 2024); Laurence Steinberg & Grace Icenogle, *Using Developmental Science to Distinguish Adolescents and Adults Under the Law*, 1 Ann. Rev. Developmental Psych. 21 (2019) (available at https://doi.org/10.1146/annurev-devpsych-121318-085105) (last accessed, October 17, 2024).

Specifically, the Sentencing Guidelines now reflect, in relevant part:

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, ***youthful individuals generally are more*** impulsive, ***risk-seeking, and susceptible to outside influence*** as their brains continue to develop into young adulthood. ***Youthful individuals also are more amenable to rehabilitation.***

U.S.S.G. § 5H1.1 (Age – Policy Statement) (emphasis added).

Here, the defendant's plea agreement provides, in relevant part, "Defendant agrees not to seek any downward departures under the U.S. Sentencing Guidelines but reserves the right – subject to the limitations set forth in this paragraph – to seek a sentencing variance pursuant to 18 U.S.C. § 3553(a)." Plea Agreement, dated, February 28, 2024 (Doc. No. 130), at 4.  At the time of Jack's March 4, 2024, guilty plea he did not know – and could not have known – that this Guideline amendment would be submitted to Congress *eight weeks later* and made effective prior to his sentencing.  Nonetheless, out of deference to the plea agreement, we do not seek a downward *departure* on this basis.  We do, however, believe it appropriate for this Court to consider Jack's age at the time of the offense under 18 U.S.C. § 3553(a)(1), as the defense always intended to

make this variance argument even before knowing that Section 5H1.1 was being expanded.  We also believe it is appropriate for this Court to consider the guidance provided by Section 5H1.1 and its commentary, when again considering whether to downward *vary* under Section 3553(a)(1).

To that end, Jack was 21 years old when he was arrested in this case, after having begun his offense conduct just one month after turning 20.  At the age of 18, adolescents are not suddenly adults who are able to make rational decisions, nor is that the case when they are 20 or 21. Rather, many adolescent/youth development experts argue that they are emerging adults, generally defined as individuals between the ages of 18 and 25, who are still developing and ruled by some of the core concepts of adolescent development. This is the very reason that U.S.S.G. § 5H1.1 was expanded.

Those components include: "***First, adolescents have less capacity for self-regulation in emotionally charged contexts, relative to adults. Second, adolescents have a heightened sensitivity to proximal external influences such as peer pressure and immediate incentives, relative to children and adults. Third, adolescents show less ability than adults to make judgements and decisions that require future orientation.***" National Research Council, Committee on Assessing Juvenile Justice Reform, Committee on Law and Justice, Division of Behavioral and Social Sciences and Education, *Reforming Juvenile Justice: A Developmental Approach* (Richard J. Bonnie, Robert L. Johnson, Betty M. Chemers, and Julie A. Schuck, Eds.), Washington, DC: The National Academies Press (2013) (available at https://nap.nationalacademies.org/catalog/14685/reforming-juvenile-justice-a-developmental-approach) (last accessed, October 17, 2024) (emphasis added).  This combination causes adolescents to "engage in risky behaviors that have a high probability of immediate reward but can have harmful consequences." *Id.*

Here, although Jack understood the consequences of his actions, his debriefing made clear that he was nonetheless driven by the internal need to uncover the veil of misinformation that his friends on Discord were relying upon – to help them understand the truth for the sake of the truth, but not for any other more nefarious purpose.

As the Center for Law, Brain & Behavior at Harvard noted, "Because adolescents exhibit different responses in the brain during decision-making, while exerting self-control, and when engaging emotion regulation, adolescent behavior is highly sensitive to emotional contexts. This renders adolescents susceptible to emotionally driven decisions, impulsive behavior, and poor judgment." *White Paper on the Science of Late Adolescence A Guide for Judges, Attorneys, and Policy Makers*, Center for Law, Brain & Behavior, January 27, 2022 (available at https://clbb.mgh.harvard.edu/wp-content/uploads/CLBB-White-Paper-on-the-Science-of-Late-Adolescence-3.pdf) (last accessed, October 17, 2024).

Most importantly we know that the brain – particularly the prefrontal cortex, an area of the brain associated with controlling impulses – is continuing to develop up until age 25: "This ongoing brain development has profound implications for decision-making, self-control and emotional processing. For example, new neuroscience research reveals that during emotionally charged situations, late adolescents (ages 18–21) respond more like younger adolescents (ages 13–17) than like young adults (ages 22–25) due to differences in brain maturation." *Id.* Furthermore, "Regions that control higher-level cognitive functions, like making complicated decisions, take much longer to be pruned, and many of these brain systems are not fully mature until the early or mid-twenties." Steinberg, Laurence D., Age of Opportunity: Lessons from the New Science of Adolescence, Houghton Mifflin Harcourt (pub.), at 26 (2014).  Jack's brain development directly

impacted his ability to control, regulate and understand his own behaviors, particularly when compounded by the unique features of his previously undiagnosed Autism Spectrum Disorder.

These concepts were recently reinforced in *Commonwealth v. Mattis*, 493 Mass. 216 (Mass. Sup. Ct. 2024), wherein the Massachusetts Supreme Court referred to a ruling by a Superior Court judge who found four core findings regarding the science of emerging adult brains based on the premise that the brains of emerging adults are not mature. *See Mattis*, 493 Mass. at 224, *citing*, *Commonwealth v. Watt*, 484 Mass. 742, 755-756 (Mass. Sup. Ct. 2020). Particularly relevant here is that the Court noted that emerging adults "have a greater capacity for change than older individuals due to the plasticity of their brains." Stated another way, a youthful defendant like Jack is also more likely to learn from his mistakes as well as from the punishment that he receives. *See also Mattis*, 493 Mass. at 223 ("[I]n *Miller*, in which the [United States Supreme] Court held that a judge must be able to consider 'mitigating qualities of youth' in formulating a sentence, the Court reiterated that youth is not simply a 'chronological fact'. Rather, '[i]t is a time of immaturity, irresponsibility, impetuousness[,] and recklessness.… It is a moment and condition of life when a person may be most susceptible to influence and to psychological damage.… And its signature qualities are all transient.'"), *quoting, Miller v. Alabama*, 567 U.S. 460, 476 (2012) (internal citations and additional quotations omitted).

### III.   <u>Defendant's Guidelines Range</u>

The Probation Department notes that Jack's Total Offense Level, after adjustment for acceptance of responsibility, is 34, and that, with a Criminal History Score of 0 and a Criminal History Category of I, his recommended sentence under the United States Sentencing Guidelines is within the range of 151 to 188 months' imprisonment. *See* PSR ¶¶ 43, 47, 48, 89.

The Probation Department reached this conclusion by beginning with a Base Offense Level of 35 and then making relevant adjustments agreed to in Mr. Teixeira's plea agreement. *See* Plea Agreement, dated, February 28, 2024, at 2-3. U.S.S.G. § 2M3.2(a)(1) provides that the "Base Offense Level" is "35, if top secret information was gathered." "Top Secret" information is defined as "information, the unauthorized disclosure of which could reasonably be expected to cause ***exceptionally grave damage*** to the national security that the original classification authority is able to identify or describe." Executive Order 13526 § 1.2(a)(1) (emphasis).

The parties agree with this calculation and do not dispute the classification level of the documents involved in this case. Indeed, Jack's Base Offense Level and total adjusted Guidelines range is important to consider because it means that the Sentencing Guidelines' recommended range of 151 to 188 months' imprisonment ***takes into account*** the ***gravity of the offense***, including that his conduct created "***exceptionally grave damage*** to the national security" of our nation. As a result, this Court can be assured that its "starting point and initial benchmark" in this case is one that has taken into account the harm that the defendant's conduct may have caused. *See Gall v. United States*, 552 U.S. 38, 49 (2007). It also provides added perspective regarding why the defense believes, after a consideration of Jack's § 3553(a) factors, a sentence of 132 months' imprisonment is reasonable, and not greater than necessary, to satisfy the purposes of sentencing in this case.

## IV.     Additional Section 3553(a) Factors

### A.     Seriousness of the Offense and Characteristics of Mr. Teixeira

18 U.S.C. § 3553(a)(1) requires this Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." Most of this submission has focused on the history and characteristics of the defendant. We recognize, however, that the offense in this

case is unquestionably serious and the binding plea agreement contemplates a serious sentence of

incarceration. The parties have agreed that any sentence between 132 to 200 months'

imprisonment is one that neither party will appeal. As such, irrespective of the sentence that the

Government seeks here, the Government necessarily agrees that a 132-month sentence of

imprisonment is one that accounts for the gravity of the offense and the seriousness of the

defendant's conduct. The defense presumes the Government's concession stems at least in part

from the fact that Jack's offense is dissimilar to others in that his motive clearly was *not* to

purposefully injure the United States or to profit from his access. Neither greed nor an intent to

harm played a role. Instead, it was Jack's profound social deficits and obsessional characteristics

that served as the impetus for his conduct.

      Additionally, a report, previously referenced, of the Inspector General of the Department

of the Air Force ("IG"), the summary of which is available online, acknowledged that there were

"Direct Contributing Factors" that played a role in his conduct. *See* IG's Report of Investigation

(S9691): Unauthorized Disclosure of National Security Information, dated, August 2023

(hereinafter cited as, "IG Report"), at ii.[19] As the Executive Summary to the report explains:

> Evidence indicates some members in A1C Teixeira's unit, reporting
> chain, and leadership had information about as many as four
> separate instances of his questionable activity. A smaller number of
> unit members had a more complete picture of A1C Teixeira's
> intelligence-seeking behaviors and intentionally failed to report the
> full details of these security concerns/incidents as outlined in DoD
> security policies, fearing security officials might "overreact." Had

---

[19]     A redacted version of the Inspector General's August 2023 report is now publicly available as a downloadable PDF via the Air Force "FOIA Reading Room" (available at <https://efoia.cce.af.mil/app/ReadingRoom.aspx>), by entering *S9691* into the Folder Name search entry. Additionally, a fully unredacted version of the first eight pages of the report (*i.e.*, the Executive Summary) is available directly at <https://www.af.mil/Portals/1/documents/2023SAF/UD_ROI_-_11_Dec_23.pdf>. The unredacted version of the complete report is annexed hereto as, "Exhibit C" (filed under seal). *See* Order, dated, October 29, 2024 (Dkt. No. 141).

> any of these members come forward, security officials would likely
> have facilitated restricting systems/facility access and alerted the
> appropriate authorities, reducing the length and depth of the
> unauthorized and unlawful disclosures by several months.

IG Report at ii.

Further, "IT specialists in the 102 ISS, including A1C Teixeira, were encouraged to receive

weekly intelligence briefings to better understand the mission and the importance of keeping the

classified networks operating. This 'know your why' effort was improper in that it provided higher

level classified information than was necessary to understand the unit's mission and created

ambiguity with respect to questioning an individual's need to know." IG Report – Executive

Summary at ii.

As explained in further detail in the IG Report:

> A "Know Your Why" concept at the 102 ISS, born from 480 ISRW
> messaging and further emphasized by the [Redacted] and two
> [Redacted], was designed to encourage Airmen to be "intellectually
> curious" and more involved in the mission. (Ex 38:22; Ex 60:3; ex
> 61:1; Ex 62:3) Implementation of this concept, which allowed IT
> specialists like Al C Teixeira, to attend TS-SCIT intelligence
> briefings in an effort to help them understand the importance of
> keeping the classified computer network operating, was poorly
> implemented in that it provided higher level classified details than
> necessary to understand the mission. This, in part, created ambiguity
> with respect to the need to know. Whether intended or not, this
> policy led to a view that being allowed to attend briefings and
> already having TS-SCI system access to perform duties, meant
> approval to search and view TS-SCI intelligence products on the
> classified network. In light of this, the initial instance of Al C
> Teixeira viewing TS-SCI intelligence before being ordered to stop
> may not have been a clearly reportable incident. However, when
> taken together with additional instances of intelligence-seeking
> behavior after being ordered to stop, the initial instance should have
> been subsequently reported. A more detailed discussion of the
> conflation of system access and need to know is discussed later in
> this report as ***one of the indirect contributing factors to the
> unauthorized release of national security information.***

IG Report at 20 (emphasis added).  The report goes on to explain that indirect contributing factors that resulted in Jack's offense conduct included his misunderstanding of the "Know Your Why" policy with his own "need to know", coupled with the lack of action taken by his supervisors to curtail potential misconduct once it became known that Jack was accessing information that he had no "need" to review.  *See* IG Report at iii ("<u>Conflation of Classified System Access with 'Need to Know' Principle</u>.  Evidence indicates some personnel, when faced with how to enforce need to know, believed having a TS-SCI clearance and access to classified systems meant users had approval to examine any information they could find on JWICS.  Mistakenly, ***many personnel*** disregarded the requirement to have a valid need to know and did not ensure the information was properly determined to be essential to effectively carry out their official duties and assignments.  As a result, there was a lack of robust validation regarding the need to know.  Computer/IT specialists require system access to perform system maintenance, but do not require access to intelligence content or products to maintain the system.") (emphasis added); *see also* IG Report at ii (discussing as a "director contributing factor[]" multiple incidents where Jack had been observed "viewing intelligence content on TS-SCI websites" and "writing information on a post-it note," but "it was never verified what was written on the note or whether it was shredded," nor were "[t]hese incidents … reported to the proper security official," as required); IG Report at iii-iv (discussing additional "indirect contributing factors" including, "Inconsistent Reporting Guidelines," "Inconsistent Need to Know Guidance," "Differences in Disciplinary Action Between Title 32 (State) and Title 10 (Federal) Members," and "Lack of Supervision/Oversight of Night Shift Operations").

Obviously, misunderstanding his own "need to know" and "Know Your Why" is not the same as misunderstanding ***anyone else's*** "need to know" – Jack clearly understood his obligation

not to share this information with his friends or anyone else.  However, this "Know Your Why" policy was nonetheless one of many "contributing factors" that inform an understanding of Jack's crimes.  Once viewed in the context of how Jack's autism impacted his daily living, these direct and indirect factors take on a greater mitigating role than otherwise would be warranted for a defendant not impacted by autism in the manner the disorder impacted him. *See, generally*, Report of Dr. Roberts (Exhibit A).

Notably, the IG review confirmed that Jack did not break Air Force rules when he reviewed the classified information that he shared. Despite not having a clear "need to know", he nevertheless had lawful access to all the information. His crime, therefore, was not his role in obtaining the information, but rather in distributing it to others who were not similarly authorized to review the information.  Further, while Jack clearly understood he was not entitled to share that information, Jack's age coupled with his autism necessarily impacted his poor decision-making.

After reviewing the parties' classified submissions, the Court can more readily understand Dr. Roberts's report of Jack's autism and its impact on his specific conduct.  Informed by the social limitations of his autism spectrum disorder, Jack naively believed that his peers would be interested in knowing the truth of the Ukraine conflict (which he considered to be the conflict of his lifetime, but one which his peers failed to fully share) and other world events, and that they could be trusted to keep that information within the group or within their conversation. His passion for the topic, and obsession with knowing and educating those in his circle with the real information about the conflict, drove his conduct. His drive (informed by his autism disorder) to get people to care about the information led to more and more sharing in an effort to get them to care. However, as discussed during Jack's debrief, once he finally realized that none of his friends seemed to care

about what he was sharing in spite of his efforts to inform them, he voluntarily ceased sharing the information:

> I thought, maybe if they could see what I was seeing they would understand more. And maybe they'd be more interested. But over time, it just waned. And as it got to a stalemate, people cared less and less. So by March 2023 I decided, well, what am I doing if I'm the only one who cares? So, just need to stop … that's why I stopped, because mild interest was not enough to like, really justify it anymore. Cause it was like well, I told – great, but unfortunately no one cares, except me. So time to stop before I get one of these people in trouble and hopefully I can just – like, basically the idea was okay I'm just gonna stop and we're gonna move on with our lives. We're gonna forget about it and say hey, remember that one time. And just live the rest of our lives and know that we knew something cool. And then that's it.

Debrief at 2:55:04 – 2:56:10.

Obviously, the damage from Jack's crimes occurred regardless of the fact that he ceased his conduct voluntarily.   That is why the defense agrees that significant punishment is still warranted.   132 months' imprisonment at this early period in Jack's life - when his peers are establishing careers, families, and maturing – is a significant punishment that more than reflects an acknowledgment by the Court of the seriousness of the offense and the wrongfulness of Jack's conduct while also balancing Jack's youth and disabilities. No greater term of imprisonment is required.

### B.   <u>Deterrence</u>

A 132-month sentence of imprisonment is more than adequate to account for general and specific deterrence. It may be questionable what value the length of a sentence has in cases like Jack's for others. Any survey of unauthorized disclosure cases leads to the conclusion that each individual's motivations are unique and unlikely to be affected by a lengthy sentence in this case.

For an individual like Jack, the prospective length of time in prison was immaterial to his autism-informed drive to tell his community what was really happening in the world.

Indeed, more important than any bare number of years in confinement for a person who makes unauthorized disclosures, Jack's participation in a debrief session, and the thorough retrospective review of what could have been done to prevent or limit his conduct, and what can be done in the future based upon that review, will have greater deterrent impact than a lengthy prison sentence.

To the extent that numbers matter – 132 months' imprisonment is serious and adequate to account for deterrence considerations and would be essentially equal to half the life that Jack has lived thus far.

### C.  Protection

No greater period of incarceration is necessary to protect the public from future disclosures by Jack.  It is clear at this point that Jack no longer has any of the papers he removed from the SCIF at Otis Air Force Base. With every day of the 132 months that Mr. Teixeira is incarcerated, any information he retains in his memory becomes more dated and less useful. It would be almost impossible to believe that at the end of a 132-month sentence that the intelligence world – *i.e.,* the methods and sources of information that he revealed – will in any way resemble that of today, making any such current information Jack retains on United States intelligence gathering techniques of dubious worth by then.

Moreover, Jack's quiet conduct while at Plymouth is sufficient to assure the Court that no further disclosures will be made, and no greater period of incarceration is necessary for protection of the public.

### D.     <u>The Need to Avoid Unwarranted Sentence Disparities</u>

Jack's Pre-Sentence Report notes that "[d]uring the last five fiscal years (FY2019-2023), there was an insufficient numbers of defendants (1) whose primary guideline was § 2M3.2, with a Final Offense Level of 34 and a Criminal History Category of I, after excluding defendants who received a § 5K1.1 substantial assistance departure; and (2) who received a sentence in whole or in part." PSR ¶ 104.  As a result, the Probation Department is unable to provide any comparative Judiciary Sentencing Information (JSIN) data from which to base a sentencing disparity analysis. There were likewise no co-defendants.

Thus, while there have certainly been other cases where the unauthorized disclosure of classified information was proven – with sentences both significantly lower and significantly higher than the agreed upon sentencing range in this case – there appears to be no recent data that presents an adequate cohort to compare to Jack.  This is particularly the case when one considers motive, given that Jack's motive is not akin to the ideological intent or pure greed present in most prior cases involving the unauthorized distribution of classified information.   As such, we respectfully submit that 18 U.S.C. § 3553(a)(6) is inapposite in this case.

[Space intentionally left blank.]

## V.    **Conclusion**

This case presents a situation where the defendant has been convicted of serious crimes amidst a perfect storm of factors.   His actions are inexcusable, and he knows it.   Jack wholeheartedly admits his guilt, sincerely regrets the decisions that he made and the harm it has caused.  Jack stands prepared to accept whatever sentence this Court deems appropriate, and there is no dispute that a lengthy sentence is appropriate in this case.  The question, however, is how lengthy must the sentence be to be sufficient, but not greater than necessary, to satisfy the purpose of imposing the sentence in the first place?

We respectfully submit that a sentence of 132 months' imprisonment is appropriate for this defendant.  The actions of Jack Teixeira are inexcusable – and this memorandum is not at all meant to minimize the impact of his actions.    However, Jack is still essentially a child – at the very least, a "youthful offender" – who has his whole life in front of him.  At 22 years old, a sentence of 132 months' imprisonment would provide more than enough time for him to grow and mature; informed by his behavior as well as from his punishment.  With the support of his family and mental health treatment providers, Jack should have little trouble living a productive life inside prison and upon his eventual release.

As this Court is well-aware, the sentence imposed upon Jack Teixeira must be sufficient, but not greater than necessary to satisfy the purposes of sentencing.  It is respectfully submitted that the mitigating circumstances outlined herein (and in Defendant's Classified Supplement), suggest that a sentence of 132 months' imprisonment would be just and appropriate in this case.

Finally, we ask that this Court recommend that the defendant be designated to FMC Devens, as suggested by Dr. Roberts's recommendations, in the hopes that he can receive more than front-line BOP psychiatric care to prepare him for release (or such other appropriate facility

as close to Dighton, Massachusetts, as possible) and to help facilitate family visitation over the term of his term of imprisonment.

Dated: New York, New York
        October 29, 2024

Respectfully submitted,

/s/ Brendan Kelley
Brendan Kelley
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
brendan_kelley@fd.org

/s/ Michael K. Bachrach
Michael K. Bachrach
Law Office of Michael K. Bachrach
224 West 30th Street, Suite 302
New York, New York 10001
(212) 929-0592
michael@mbachlaw.com

*Attorneys for Defendant Jack Teixeira*

/s/ Anna Bulkin
Anna Bulkin, MSW, LICSW

*Mitigation Specialist for Defendant Jack Teixeira*

### Certificate of Service

I, Michael K. Bachrach, hereby certify that this document was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF").

Date:   October 29, 2024

/s/ Michael K. Bachrach
Michael K. Bachrach